# THE CITY OF BOWIE, ET AL. *v.* COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY

[No. 432, September Term, 1969.]

*Per Curiam Order May 13, 1970.*

*Opinion Filed June 5, 1970.*

456

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Ferdinand J. Mack,* with whom were *Shadoan & Mack* on the brief, for appellants.

*Richard W. Case,* with whom were *John T. Joseph* and *Smith, Somerville & Case* and *Lionell M. Lockhart, County Attorney,* and *Harry L. Durity, Deputy County Attorney,* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The appellants are the City of Bowie and various individuals who are residents and taxpayers of Prince George's County living in or near Bowie, and their appeal is a continuation of one of several efforts they have made and are making, all so far unsuccessful, to prevent the construction by Prince George's County of an airport near Bowie.

The building of the airport was authorized by the General Assembly by Chapter 689 of the Laws of 1968 which authorized and empowered the County Commissioners for Prince George's County (a) to acquire land and air rights "generally in the southwest quadrant of the intersection of Maryland Route 214 and U.S. Route 301," and construct and equip thereon an airport, and (b) to pay therefor by the exercise of a grant of power to borrow from time to time up to $8,300,000, such borrowings to

be evidenced "by the issuance and sale upon [the County's] full faith and credit of its serial maturity, general obligation coupon bonds in like par amount, upon the terms and conditions hereinafter set forth.' The first term and condition was that:

"the County shall, before borrowing any money or issuing any bonds * * * adopt a resolution describing the airport facilities * * * for which said borrowing * * * is intended, the amount needed for said purposes in the aggregate * * * and to issue its bonds to evidence such borrowing * * *."

The bonds, Ch. 689 went on to require, must mature in annual serial instalments, the last to mature not later than thirty years from the date of issue. Chapter 689 continued:

"Subject to the limitations herein contained, said County shall have and is hereby granted full and complete authority and discretion to fix and determine, in said resolution, the form and tenor of any such bonds, the rate or rates of interest payable thereon, or the method of arriving at the same, the date or dates upon which said bonds shall respectively mature and be payable, the manner of selling said bonds at public sale, and generally all matters incident or necessary to the issuance, sale and delivery thereof. The bonds of each such issue shall be dated, shall bear interest at such rate or rates not exceeding six per centum (6%) per annum, payable semiannually, shall mature at such time or times as may be determined by said resolution, and said bonds may, by said resolution, be made redeemable before maturity, at the option of the County, at such price or prices and under such terms and conditions as may be fixed by said County, either in said resolution or in subsequent resolutions,

but prior to the issuance of said bonds. The principal of and the interest on said bonds may be made payable [in] any lawful medium. Said resolution shall determine the form of said bonds, including any interest coupons to be attached thereto, and the manner of executing and sealing the same, which may be by facsimile, and shall fix the denomination or denominations of the bonds and the place or places of payment of the principal and interest thereon, which may be any bank or trust company within or without of the State of Maryland."

Provision was then made for a notice of sale and an invitation to bid. The bonds issued pursuant to Ch. 689 were made to constitute "an irrevocable pledge of the full faith and credit and unlimited taxing power of the County to the payment of the maturing principal and interest."

On October 15, 1968, without prior notice or hearing, the County Commissioners adopted a resolution (the Resolution) which in Section 1B recited that:

"acting pursuant to the authority of Chapter 689 of the Laws of Maryland of 1968 the County hereby determines that it is necessary to borrow money and incur indebtedness for the purpose of financing, in part, the construction, acquisition, improvement or extension of public airport facilities and a related industrial park [also authorized by Ch. 689] to be located in Prince George's County, generally in the southwest quadrant of the intersection of Maryland Route 214 and U.S. Route 301, including the acquisition and development of sites therefor, and the architectural and engineering service incident thereto * * *."

In Section 2B of the Resolution, the County Commissioners directed that pursuant to Ch. 689, there be issued and sold $5,250,000 of the serial maturity coupon bonds of

the County to be known as the "Industrial Airpark Facilities Bonds of 1968," the net proceeds to be used "for the purposes described in Section 1B of this Resolution."

Section 3B provided for the denomination and form of the bonds, the annual serial maturity in the principal amount of $210,000, and maturity dates for the bonds.

Section 4 of the Resolution reiterated that the bonds were to be issued and sold on the full faith and credit of the County, were to be coupon bonds and were to "bear interest at the rate or rates named by the successful bidder or bidders [up to the 6% limit set by Ch. 689]."

The bonds so authorized were, after proper advertisement, sold on October 29, 1968, to Morgan Guaranty Trust Company.

On November 19 the Commissioners adopted a confirming resolution ratifying and approving the Resolution of October 19 and another resolution which accepted Morgan Guaranty's offer to purchase, and all of their provisions, and declaring such resolutions "to be emergency measures necessary for the immediate preservation of the safety, health or welfare of the public and, consequently, shall take effect from the date of their passage."

On November 26 the County delivered the bonds and received the purchase price.

In June 1969 appellants filed a bill in the Circuit Court for Prince George's County to have the bonds declared illegally issued and invalid. A partial summary judgment that the bonds were validly issued was granted orally in July (and apparently in writing on October 10), and on January 19, 1970, Judge Digges entered final judgment, holding that the Resolution was a valid and effective act and that the bonds issued and delivered to Morgan Guaranty Trust Company "were lawfully authorized, sold, issued and delivered and constitute valid, legally binding and enforceable general obligations of the County Comsioners of Prince George's County to which its full faith and credit are pledged." On May 13, 1970, by per curiam order, we affirmed the judgment appealed from.

. Below and here the appellants claimed the issue and sale of the bonds to be illegal for two main reasons.

First, they say that the Commissioners neither gave notice that they proposed to act nor held a hearing prior to adopting the Resolution, that in adopting that resolution they acted in a legislative capacity and Ch. 191 of the Laws of 1968 (which added a new Section 18-1 (h) to the Code of Public Local Laws of Prince George's County (1963 Edition)[1] requires notice and hearing as to "all acts, ordinances, resolutions, or amendments thereto adopted by the Board [of County Commissioners] in its legislative capacity." Second, appellants say the Resolution does not meet the requirement of Ch. 689 that the authorizing resolution shall describe the airport facilities for which the proceeds of the borrowing are intended.

. The appellees argue and the lower court found that the Commissioners acted in an executive capacity in adopting the Resolution and no notice of or hearing on such action

1. Ch. 191 reads in pertinent part:

"(h) Ordinances.

All acts, ordinances, resolutions, or amendments thereto adopted by the Board in its legislative capacity are subject to public hearings and public notice, as provided herein:

(1) Public Notice and Hearings—No act, ordinance or amendments thereto shall be adopted by the Board until [ten] (10) days after a public hearing, and no later than ninety (90) days after the last scheduled hearing on the proposal, except, on motion made within the ninety (90) day period, the time after public hearings may be extended up to sixty (60) additional days.

(2) All legislative sessions shall be open to the public; all votes taken on acts, ordinances, resolution, or amendments thereto, shall be taken publicly and recorded.

(3) Notice of proposed hearings shall be published in at least one (1) newspaper of general circulation in the county at least once each week for two (2) successive weeks beginning thirty days prior to the hearing. A copy of the proposal or a fair summary of the proposal shall be included in the notice.

(4) The provisions of this section shall not apply to any act, ordinance, resolution, or amendment thereto that shall be declared to be an emergency measure necessary for the immediate protection or preservation of the safety, health, or welfare of the public, and adopted by a vote of not less than two-thirds of all the members of the Board of County Commissioners."

was required, and that the description of the airport in their resolution was adequate. Appellees say further that Ch. 191 exempts from the notice and hearing requirements established by it any act, ordinance, resolution or amendment thereto "that shall be declared to be an emergency measure * * *," and, assuming the adoption of the Resolution was a legislative act, that the ratifying resolution of November 19, declaring an emergency, cured any defects in the Resolution. In the view we take of the case we do not reach the last contention.

We agree with Judge Digges that the Commissioners did not act legislatively but, rather, executively or administratively in adopting the Resolution. The legislative act was that of the General Assembly in passing Ch. 689. That legislative act included specific directions to the County to execute the authority granted and to implement the legislation. It long has been recognized in Maryland that County Commissioners in much of their functioning act as administrators or in an executive capacity. Historically, County Commissioners are outgrowths of the old levy courts (originally established by Ch. 53 of the Laws of 1794), which were composed of the justices of the peace of the several counties. Their duties were to meet and determine the necessary expenses of their counties and to impose an assessment or rate on property to defray county expenses. The name "County Commissioners" was first constitutionally recognized in the Constitution of 1851. This brief review was set out in *Cox v. Board of County Comm'rs of Anne Arundel County*, 181 Md. 428, 433-434, after which Judge Ogle Marbury for the Court said:

> "When the present Constitution of 1867 was adopted, Art. VII, Section 1, provided that the powers and duties of county commissioners should be such 'as now or may be hereafter prescribed by law.' Until the Constitution of 1867, county commissioners were simply administrative officers in charge of county finances, and

taking care of public roads. * * * After the Constitution of 1867 these powers could be broadened by legislative authority * * *."

A scanning of Art. 25 of the Code, "County Commissioners," and of Section 18-1 of the Code of Public Local Laws of Prince George's County (1963 Ed., as amended by Ch. 898 of the Laws of 1965), reveals that county commissioners continue to have administrative and executive powers and duties and have acquired specified legislative powers and duties, as Ch. 191 itself emphasizes in requiring notice and hearing in Prince George's County only when the commissioners act legislatively.

There can be no real doubt that an agency of the State to which power to act has been delegated by the legislature may, in using discretion and making choices in the exercise of the delegated power, act either administratively or executively, on the one hand, or on the other, legislatively. "The determinative is the quality of the process." *Eliason v. State Roads Comm'n*, 231 Md. 257, 261, *cert. den.* 375 U. S. 914. See, too, *Pressman v. D'Alesandro*, 193 Md. 672, where in referring to the power of the Board of Estimates, conferred by legislation, to use the proceeds of a bond issue either to reconstruct an existing athletic stadium or build a new stadium on the same site or on a new site, Judge Markell for the Court said at page 678 of 193 Md.:

"Plaintiffs say the power to choose is a legislative power conferred upon the City Council as such and not delegable by it. They quote a dictum in *Baltimore City v. Steward*, 92 Md. 535, 549-550, 48 A. 165, to the effect that a broad and unrestricted delegation of a power to decide whether a street shall be paved with asphalt or with brick would be unlawful. This dictum was explained and rejected as dictum in *Baltimore City v. Gahan*, 104 Md. 145, 152-153, 64 A. 716. If it were necessary for us to decide, we should be loath to hold that choice between the existing

stadium and a new stadium at the same or a different location is a non-delegable legislative power, *e.g.*, is more than 'the discretion necessarily belonging to a workman employed to do a work.' *Baltimore v. Scharf*, 54 Md. 499, 522. The 'necessary discretion' of a workman is relative to the nature and magnitude of the work. More discretion in administrative boards and expert officials is necessary in a project of the size and technical complexity of constructing or reconstructing a 'modern stadium' than in laying a boardwalk in a Colonial village."

The test to determine when action is legislative and when executive or administrative was spelled out in *Scull v. Montgomery Citizens League*, 249 Md. 271, 282, in considering the Montgomery County Charter which continued the system of dual capacities that existed in the county commissioners by making the County Council both the legislative body and the executive. We said:

"The distinction made and the compartmentalization insured by the Charter between legislation on the one hand and administration and execution on the other is a distinction that has been acknowledged and acted upon by legislative bodies and the courts of other States. A recognized test for determining whether a municipal ordinance is legislative and so subject to referendum, or whether it is executive or administrative and is not, is whether the ordinance is one making a new law—an enactment of general application prescribing a new plan or policy—or is one which merely looks to or facilitates the administration, execution or implementation of a law already in force and effect. *Kelley v. John*, 75 N.W.2d 713, 715 (Neb. 1956) (comprehensive zoning plan) ; *Keigley v. Bench*, 89 P. 2d 480, 483-85 (Utah 1939) ; *Blankenship v. City of Richmond*, 49 S.E.2d 321, 323-25 (Va. 1948)

(ordinance regulating the use of property) ; *Vanmeter v. City of Paris,* 273 S.W.2d 49, 50 (Ky. 1954) ; *Bachmann v. Goodwin,* 3 S.E.2d 532 (W. Va. 1939) (repeal of a public housing authority)."

Other cases more nearly like that at bar that have recognized and applied this test are *Tillamook Peoples' Utility Dist. v. Coates* (Ore.), 149 P. 2d 558, 560, where the Court, speaking of an ordinance adopted pursuant to authorization by the voters of the district of the issuance and sale of bonds by the district in the amount of $750,000 for the purchase and construction of an electrical power plant, said :

"The ordinance [being attacked] was designed to effectuate the will of the voters of the district expressed by their vote in approving the $750,000 bond issue. It specified the denomination and form of the bonds, the rate of interest to be paid, maturity dates and other matters common to utility bonds. Such an ordinance is administrative rather than legislative in character,"

and *State ex rel. Ballantyne v. Leeman* (Neb.), 32 N.W.2d 918, which held that the adoption of a home rule amendment by the voters directing the issuance of $3,540,000 of municipal bonds to acquire land and build a city auditorium was a legislative act and the ordinance adopted pursuant thereto to carry out the act was an executive or administrative act; *Volusia County v. State* (Fla.), 125 So. 375, 380, quoting 15 C.J. 623, to the effect that "the form, the terms and the conditions of county bonds are matters of administration and detail which the legislature may properly leave to the consideration and discretion of the county board * * *"; *Monahan v. Funk* (Ore.), 3 P. 2d 778, 780; and *Whitebeck v. Funk* (Ore.), 12 P. 2d 1019. See also *State ex rel. Didelius v. City of Sandusky* (Ohio), 2 N.E.2d 862; *Seaton v. Lackey* (Ky.), 182 S.W.2d 336; *Whitehead v. H. & C. Development Corp.*

(Va.), 129 S.E.2d 691, 695; 2 McQuillin *Municipal Corp.* (3rd Ed.), § 10:06; and Vol. 5 of that work § 16:55, pp. 213-214; and *Hormes v. Baltimore County*, 225 Md. 371, 377-378.

In *Schneider v. Lansdale*, 191 Md. 317, 325-326, the Court reviewed the history of county commissioners more elaborately than it had in *Cox, supra*, and said:

> "As a result, we have an unbroken line of county authorities from the original Provincial county courts to the County Commissioners at the present time, and continuing to a County Council, if one is established under a charter, all authorized to exercise the power of fixing the county expenditures and raising money to defray them. This is, therefore, not a new power conferred upon the counties by Article XIA, but on the contrary is a power always previously exercised by some local agency in every county. It was not exercised though it was authorized, by the General Assembly, and was not 'legislation' in any ordinary sense in which the word is used."

The holding was that the making of the budget and the appropriation and tax levy "are none of them legislation * * *."

In *Bond v. Baltimore*, 118 Md. 159, the act of the legislature authorizing the issuance and sale of Baltimore City stock provided that the stock was to be issued from time to time and in such amounts as the Mayor and City Council "shall by ordinance prescribe." The ordinance did not specify the times or amounts. The Court said (p. 170 of 118 Md.):

> "The power or discretion delegated to the Commissioners of Finance to issue the stock from time to time and at such times as shall be requisite is not, we think, an unlawful delegation of power or discretion, when by the statute it is to be issued and sold by them when and as

portions of the work are being done and as we may add, when the money is required with which to pay for such work done by and upon the authority of the Paving Commission.

"* * * While [the ordinance] does not fix the rate of interest to be paid upon the stock, it limits such rate to four per centum per annum, and the Finance Commission, in whom is vested the right to sell said stock at the best prices obtainable in their judgment, in establishing the rate of interest, is restricted to a rate not in excess of four per centum. We do not think the delegation of this restricted discretion here given to the Finance Commission in fixing a lower rate of interest, is unlawful, and especially so when considered in connection with the power vested in them by the Act to sell said stock and at the best prices obtainable in their judgment.

"It may also be said that the delegation of the power and discretion here complained of will be found in the Burnt District Loan, the Annex Paving Loan, the Sewerage Loan and other similar ordinances."

See also *Mayor & City Council v. Wollman,* 123 Md. 310, 315-316; *Douty v. Baltimore,* 155 Md. 125, 135-136.

It is clear to us that in adopting the Resolution the Commissioners did not make law but rather executed and implemented a law already in exsitence and therefore the requirements of Ch. 191 of notice and a hearing were not required to be met. Compare *Eliason v. State Roads Comm'n, supra; Bernstein v. Board of Education,* 245 Md. 464, 473; and *Albert v. Public Serv. Comm'n,* 209 Md. 27.

We think the Resolution described the airport facilities for which money was being borrowed sufficiently to gratify fully Ch. 689. In the first place, Ch. 689 informed the world that if the airport were built it would be in the southwest quadrant of Maryland Route 214 and U.S.

Route 301, and that it would cost up to $8,300,000. The Resolution described the location in the words of Ch. 689 and recited that a public airport would be built at that location at a cost of millions of the dollars that were to be borrowed. The obvious purpose of the required description is to inform the citizens of where and for what the borrowed money is to be spent. The description challenged here did that adequately. The requirement is not unlike the provision in Art. III, § 29, of the Constitution of Maryland that "every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." This Court consistently has held that an essential purpose of this constitutional requirement is "to inform the members of the legislature and the public of the nature of the proposed legislation," and has said that "the Constitution is complied with if the title of the statute *fairly* advises * * * of the real nature and subject matter of the legislation." *Baltimore Transit Co. v. Metropolitan Transit Authority,* 232 Md. 509, 521; Everstine, *Titles of Legislative Acts,* 9 Md. L. Rev. 197, 218-227. The description in the Resolution fairly advises of the nature and subject matter of the project to be built with the borrowed funds. In accord are the cases of *State v. Manatee County Port Authority* (Fla.), 171 So. 2d 169; *Sublett v. City of Tulsa* (Okla.), 405 P.2d 185; and *Volusia County v. State* (Fla.), 125 So. 375, 379, cited earlier on a related point.

These are the reasons for the per curiam order of affirmance.