855 A.2d 325

**QUEEN ANNE'S CONSERVATION, INC.**

v.

**THE COUNTY COMMISSIONERS OF QUEEN ANNE'S COUNTY, MD, et al.**

**No. 108, Sept. Term, 2003.**

Court of Appeals of Maryland.

July 29, 2004.

C. Daniel Saunders (Christina Harding Landskroener, Chestertown, on brief), for appellant.

John H. Zink, III (Kathleen E. Wherthey, Venable LLP, Towson, on brief), Joseph A. Stevens (Law Offices of Stevens & Associates, LLC, Centreville, on brief), (Nancy L. Slepicka, Fossett & Brugger, Chartered, Greenbelt, Patrick E. Thompson, Foster, Braeden, Thompson & Palmer, Stevensville, on brief), for appellees.

Jon W. Luther, Washington, DC, as amicus curiae, for appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

Development Rights and Responsibilities Agreements ("DRRAs") are a relatively recent addition to the Maryland toolbox of land use and development implements approved by the Legislature for possible use by many local political subdivisions and the legal or equitable owners of real properties desiring to develop their properties. Although many states, such as California in 1979, preceded Maryland in recognizing the use of DRRAs or their equivalents, our Legislature lingered until 1995 before enacting § 13.01 ("Development Rights and Responsibilities Agreements") of Article 66B ("Land Use") of the Maryland Code.[1] The legislation seems to

---

1. Article 66B generally regulates land use (planning and zoning) in Maryland's non-charter, Code home rule counties, Baltimore City, and

be the result of the balancing of developers' and property owners' desires for a larger measure of certainty than that offered by proceeding to market through the traditional development processes, while risking the monetary investment to develop their property, against local governments' desire to receive greater public benefits on a more predictable schedule than might otherwise be attainable through the traditional processes. *See generally,* Brad K. Schwartz, *Development Agreements: Contracting for Vested Rights,* 28 B.C. ENVTL. AFF. L. REV 719 (2001); David L. Callies and Julie A. Tappendorf, *Unconstitutional Land Development Conditions and The Development Agreement Solution: Bargaining For Public Facilities After Nollan and Dolan,* 51 CASE W. RES. L. REV. 663 (2001); John J. Delaney, *Development Agreements: The Road From Prohibition to "Let's Make a Deal!,"* 25 URB. LAW. 49 (1993).

As explained in the amicus brief of the National Association of Home Builders filed in the present case:

"[A] central purpose of the development agreement is to vest development rights in the landowner or developer in exchange for the dedication and funding of public facilities. A vested right allows development of a proposed use of land to proceed even when subsequent changes in zoning regulations would render the proposed use impermissible....

"Development agreements are public contracts between a municipality and a property owner or developer, and are executed pursuant to state law as part of the development approval process. Such agreements can be executed in conjunction with the rezoning of land, at a post-zoning stage of the development review process (such as subdivision or

---

municipalities possessing planning and zoning powers; however, of relevance to DRRAs, § 1.02(b) of Article 66B makes applicable also to chartered counties (except Montgomery County and Prince George's County) the provisions of § 13.01. Ordinarily, the planning and zoning powers exercised by charter counties in Maryland flow from Article 25A, § 5(X) of the Maryland Code, except for Montgomery and Prince George's counties which look to Article 28 of the Maryland Code for enablement of their planning and zoning authority.

site plan review), or at the time of permit approval. Aside from developers and builders, [local governments] find these agreements advantageous as sources of funding for major infrastructure, and as an assurance for the timely provision of needed public facilities and amenities."

Amicus brief at 2–4 (footnotes omitted).

The present case does not call for us to scrutinize the validity of § 13.01 of Article 66B or even of the execution of the particular DRRA that instigated the litigation. Rather, this appeal touches upon an important, but tangential threshold issue, which necessitates that we determine the correct path to be followed by a person or entity, not a party to a DRRA, but who feels aggrieved by the execution of the agreement, in obtaining scrutiny of the legal bona fides of the DRRA.

## I.

On 17 September 2002, a DRRA was entered into by K. Hovnanian at Kent Island, L.L.C., ("Hovnanian") and the County Commissioners of Queen Anne's County ("the County Commissioners"). Shortly thereafter, the Queen Anne's Conservation Association, Inc., and seven individual plaintiffs (collectively "the Conservation Association") filed a Complaint in the Circuit Court for Queen Anne's County, naming Hovnanian and the Commissioners as defendants, seeking declaratory and injunctive relief to the effect that the DRRA was invalid. In response, the defendants filed a Motion to Dismiss urging that the Conservation Association failed to exhaust available, exclusive administrative remedies before seeking judicial scrutiny.

The Circuit Court entered judgment in the defendants' favor on 25 February 2003, preeminently holding in its declaratory judgment that the Conservation Association failed to follow the statutory procedure for appeals of administrative decisions to the Board of Appeals for Queen Anne's County. The result was dismissal of the Complaint because the Conservation Association, having missed the deadline for noting such

an administrative appeal, could not now perfect one. The Conservation Association appealed to the Court of Special Appeals. We, on our initiative and before the appeal could be decided in the intermediate appellate court, issued a writ of certiorari to determine whether the Circuit Court properly dismissed the Complaint for declaratory and injunctive relief based on the Conservation Association's failure to exhaust administrative remedies. *Queen Ann's Conservation v. County Commissioners*, 379 Md. 224, 841 A.2d 339 (2004).

Appellants, the Conservation Association, present the following two questions for our consideration:

I. Where Queen Anne's County has no administrative remedy available to challenge a developer's rights and responsibilities agreement by appeal to the Queen Anne's County Board of Appeals, is such a challenge properly brought in a declaratory action?

II. Is an administrative appeal from a developer's rights and responsibilities agreement mandated by Article 66B, § 4.08, which applies to "zoning actions" of a local legislative body?

We hold that Appellants, in pursuing a challenge to the execution of the DRRA in this case, were first required to file an appeal to the Board of Appeals and obtain a final administrative decision prior to seeking judicial review in the Circuit Court. Therefore, we shall affirm the Circuit Court's judgment dismissing this action for Appellants' failure to exhaust an available and exclusive administrative remedy. Accordingly, we need not address the second question raised by Appellants.

## II.

Hovnanian is the developer of a proposed "active adult, age-restricted community" on Kent Island in Queen Anne's County. The 560–acre community is to be known as Four Seasons at Kent Island ("Four Seasons") and would consist of 1,350 residential units, an assisted living facility, and recreational uses. The Four Seasons property is zoned, in the vernacular

of the Queen Anne County zoning ordinance, Stevensville Master Planned Development Zone and Chester Master Planned Development Zone. The property is identified in both the Chester Community Plan of 1997 and the Stevensville Community Plan of 1998 as a "Planned Growth Area" and was "pre-mapped" to receive a Chesapeake Bay Critical Area Growth Allocation. The uses sought by Hovnanian were permitted ones generally under the existing zoning, but subject to subdivision and site plan review and approval processes.

### A. Administrative Proceedings

Hovnanian submitted an application to the Queen Anne's County Planning Commission (the Planning Commission) for Concept/Sketch Plan approval for Four Seasons in June 1999. The application was reviewed by Queen Anne's County planning and public work officials, Chesapeake Bay Critical Area Commission staff, and various other State and County departments and agencies. On 26 April 2000, the Planning Commission approved the Concept/Sketch Plan. Hovnanian next filed a petition with the County Commissioners requesting Growth Allocation approval to change the Chesapeake Bay Critical Area Land Use Designations on the property. The petition requested that roughly 293.25 acres be redesignated from the Chesapeake Bay Critical Area designation of Resource Conservation Area to Intense Development Area, and roughly 79.55 acres be redesignated from Limited Development Area to Intense Development Area.

Following a public hearing before it on 13 July 2000, the Planning Commission recommended that the County Commissioners approve Hovnanian's request for Growth Allocation, subject to certain conditions, one of which was that Hovnanian enter into a DRRA with the County before final plan approval. On 6 December 2000, after yet another public hearing, the Chesapeake Bay Critical Area Commission endorsed the Petition for Growth Allocation, also with certain conditions.

The County Commissioners conducted another public hearing on 27 February 2001. As a result, the County Commissioners made substantial and detailed findings of fact concern-

ing Hovnanian's request for Growth Allocation. On 10 April 2001, the County Commissioners approved the redesignation of the Chesapeake Bay Critical Area Land Use Designations of the Four Seasons property, subject to conditions, including the execution of a DRRA.

On 14 June 2001, the Planning Commission reviewed and approved an amended Concept/Sketch Plan for the Four Seasons, which had been revised to reflect the later conditions imposed by the Planning Commission, the Critical Area Commission, and the County Commissioners during the Growth Allocation process. On 20 August 2001, the County Commissioners adopted ordinances that required a DRRA as a condition of the Growth Allocation approval.

Ultimately, on 20 May 2002, Hovnanian filed a Petition for a DRRA, pursuant to the enabling legislation in Maryland Code (1957, 2003 Repl.Vol.), Article 66B § 13.01 [2] and the imple-

---

**2.** Maryland Code (1957, 2003 Repl.Vol.), Article 66B § 13.01 states:

(a) *Definitions.*—(1) In this section the following words have the meanings indicted.

(2) "Agreement" means a development rights and responsibilities agreement.

(3) "Governing body" means the local legislative body, the local executive, or other elected governmental body that has zoning powers under this article.

(4) "Public principal" means the governmental entity of a local jurisdiction that has been granted the authority to enter agreements under subsection (b)(1) of this section.

(b) *Authority and delegation of authority.*—(1) Subject to subsections (c) through (1) of this section, the governing body of a local jurisdiction may:

(i) By ordinance, establish procedures and requirements for the consideration and execution of agreements; and

(ii) Delegate all or part of the authority established under the ordinance to a public principal within the jurisdiction of the governing body.

(2) The public principal may:

(i) Execute agreements for real property located within the jurisdiction of the governing body with a person having a legal or equitable interest in the real property; and

(ii) Include a federal, State, or local government or unit as an additional party to the agreement.

(c) *Petition.*—Before entering an agreement, a person having a legal or equitable interest in real property or the person's representative

shall petition the public principal of the local jurisdiction in which the property is located.

(d) *Public hearing.*—(1) After receiving a petition and before entering an agreement, the public principal shall conduct a public hearing.

(2) A public hearing that is required for approval of the development satisfies the public hearing requirements.

(e) *Approval by commission.*—The public principal of a local jurisdiction may not enter an agreement unless the planning commission of the local jurisdiction determines whether the proposed agreement is consistent with the plan of the local jurisdiction.

(f) *Contents of agreement.*—(1) An agreement shall include:

(i) A legal description of the real property subject to the agreement;

(ii) The names of the persons having a legal or equitable interest in the real property subject to the agreement;

(iii) The duration of the agreement;

(iv) The permissible uses of the real property;

(v) The density or intensity of use of the real property;

(vi) The maximum height and size of structures to be located on the real property;

(vii) A description of the permits required or already approved for the development of the real property;

(viii) A statement that the proposed development is consistent with the plan and development regulations of the local jurisdiction;

(ix) A description of the conditions, terms, restrictions, or other requirements determined by the governing body of the local jurisdiction to be necessary to ensure the public health, safety, or welfare; and

(x) To the extent applicable, provisions for the:

1. Dedication of a portion of the real property for public use;

2. Protection of sensitive areas;

3. Preservation and restoration of historic structures; and

4. Construction or financing of public facilities.

(2) An agreement may:

(i) Fix the time frame and terms for development and construction on the real property; and

(ii) Provide for other matters consistent with this article.

(g) *Time limitations.*—An agreement shall be void 5 years after the day on which the parties execute the agreement unless:

(1) Otherwise established under subsection (f)(1)(iii) or (2)(i) of this section; or

(2) Extended by amendment under subsection (h) of this section.

(h) *Amendment of agreements.*—(1) Subject to paragraph (2) of this subsection and after a public hearing, the parties to an agreement may amend the agreement by mutual consent.

(2) Unless the planning commission of the local jurisdiction determines that the proposed amendment is consistent with the plan of the local jurisdiction, the parties may not amend an agreement.

(i) *Termination of agreements; suspension.*—(1) The parties to an agreement may terminate the agreement by mutual consent.

(2) If the public principal or the governing body determines that suspension or termination is essential to ensure the public health,

menting provisions of Queen Anne's County Code ("QACC") §§ 18–1301 through 1311.[3] The draft DRRA was vetted

safety, or welfare, the public principal or its governing body may suspend or terminate an agreement after a public hearing.

(j) *Applicable laws, regulations and policies.*—(1) Except as provided in paragraph (2) of this subsection, the laws, rules, regulations, and policies governing the use, density, or intensity of the real property subject to the agreement shall be the laws, rules, regulations, and policies in force at the time the parties execute the agreement. (2) If the local jurisdiction determines that compliance with laws, rules, regulations, and policies enacted or adopted after the effective date of the agreement is essential to ensure the health, safety, or welfare of residents of all or part of the jurisdiction, an agreement may not prevent a local government from requiring a person to comply with those laws, rules, regulations, and policies.

(k) *Recording.*—(1) An agreement that is not recorded in the land records office of the local jurisdiction within 20 days after the day on which the parties execute the agreement is void.

(2) The parties to an agreement and their successors in interest are bound to the agreement after the agreement is recorded.

(*l*) *Enforcement by interested parties.*—Unless the agreement is terminated under subsection (i) of this section, the parties to an agreement or their successors in interest may enforce the agreement.

(m) *Adoption of ordinance not required.*—This section does not require the adoption of an ordinance by a governing body or authorize a governing body to require a party to enter into an agreement.

**3.** Queen Anne's County Code §§ 18–1301 through 1311 (2004) state:

18–1301. *Definitions.*—Unless otherwise provided in this subtitle, the definitions provided in § 18–1–001 of this title shall apply.

18–1302. *Authority.*—The County Commissioners for Queen Anne's County shall exercise the authority granted by Section 13.01 of Article 66B, Zoning and Planning, of the Annotated Code of Maryland to enter into development rights and responsibility agreement.

18–1303. *Applicability.*—Any person having a legal or equitable interest in real property in Queen Anne's County may petition the County Commissioners for Queen Anne's County to enter into an agreement.

18–1304. *Contents of development rights and responsibilities agreement.*—(a) At a minimum a development rights and responsibilities agreement shall contain the following:

(1) A lawyer's certification that the petitioner has either a legal or equitable interest in the property;

(2) The names of all parties having an equitable or legal interest in the property, including lien holders;

(3) A legal description of the property subject to the agreement;

(4) The duration of the agreement;

(5) The permissible uses of the real property;

(6) The density or intensity of use;

(7) The maximum height and size of structures;

(8) Description of the permits required or already approved for the development of the property;

(9) A statement that the proposed development is consistent with applicable development regulations, the Comprehensive Plan and Growth Area Plan;

(10) A description of the conditions, terms, restrictions or other requirements determined by the County Commissioners, or their designees, to be necessary to ensure the public health, safety and welfare;

(11) To the extent applicable, provisions for:

(i) Dedication of a portion of the real property for public use.

(ii) Protection of sensitive areas;

(iii) Preservation and restoration of historic structures.

(iv) Construction or financing of public facilities;

(v) Responsibility for attorney's fees, costs and expenses incurred by the County Commissioners in the event an agreement is abandoned or breached by the petitioner.

(b) An agreement may fix the period in and terms by which development and construction may commence and be completed, as well as provide for other matters consistent with this title.

18–305. *Referral to Planning Commission.*—Upon receipt of a petition, the County Commissioners shall refer the petition to the Planning Commission for a determination whether the proposed agreement is consistent with the Comprehensive Plan and, where applicable, the Growth Area Plan. The County Commissioners may not enter into an agreement unless the Planning Commission determines whether the proposed agreement is consistent with the Comprehensive Plan and, where applicable, the growth area plan.

18–306. *Public Hearing.*—Before an agreement may be executed by the County Commissioners, the County Commissioners shall hold a public hearing on the agreement. Notice of the hearing shall be published in a county newspaper of general circulation once each week for two consecutive weeks, with the first such publication of notice appearing at least 14 days prior to the hearing. The notice shall contain the name of the petitioner, a brief description sufficient to identify the property involved, a fair summary of the contents of the petition and the date, time and place of the public hearing.

18–1307. *Amendment of agreements.*—(a) Subject to paragraph (b) of this subsection and after a public hearing, the parties to an agreement may amend the agreement by mutual consent.

(b) The parties may not amend an agreement unless the Planning Commission determines whether the proposed amendment is consistent with the Comprehensive Plan and, where applicable, the Growth Area Plan.

18–1308. *Termination of agreements; suspension.*—(a) The parties to an agreement may terminate the agreement by mutual consent.

(b) After a public hearing, the County Commissioners may suspend or terminate an agreement if the County Commissioners determine that suspension or termination is essential to ensure the public health, safety or welfare.

through a series of hearings before the Planning Commission and the County Commissioners.

On 11 July 2002, the Planning Commission considered the proposed DRRA at a public hearing. At the hearing, the Planning Commission indicated that there were certain technical issues that yet needed to be addressed, but concluded nonetheless that the proposed DRRA was consistent with the 2002 Comprehensive Plan for Queen Anne's County, as well as the applicable Stevensville and Chester Community Master Plans.

The County Commissioners held a public hearing on the proposed DRRA on 6 August 2002. Following the public hearing, the proposed DRRA was modified based on comments from all the previous hearings. On 17 September 2002, a final DRRA was executed by Hovnanian and the County Commissioners. In pertinent part, the DRRA: (1) established limitations on allowable development, including limitations on density and intensity; (2) established detailed requirements concerning public improvements to be financed by Hovnanian,

18–1309. *Applicable laws, regulations and policies.*—(a) Except as provided in paragraph (b) of this subsection, the laws, rules, regulations and policies governing the use, density or intensity of the real property subject to the agreement shall be the laws, rules, regulations and policies in force at the time the County Commissioners and the petitioner execute the agreement.

(b) An agreement may not prevent compliance with the laws, rules, regulations and policies enacted after the date of the agreement, if the County Commissioners determine that imposition and compliance with these laws and regulations is essential to ensure the public health, safety or welfare of residents of all or part of Queen Anne's County.

18–1310. *Recording.*—(a) An agreement shall be void if not recorded in the land records of Queen Anne's County within 20 days after the day on which the County Commissioners and the petitioner execute the agreement.

(b) When an agreement is recorded, the County Commissioners and the petitioner, and their successors in interest, are bound to the agreement.

18–1311. *Enforcement by interested parties.*—Unless terminated under § 18–308 of this subtitle, the County Commissioners or the petitioner, and their successors in interest, may enforce the agreement.

including a dedication of parkland, construction of park facilities, purchase of off-site parkland, construction and reconstruction of public roads and paths, and construction of public facilities both on-site and off-site; (3) established timing for water and sewer allocation; (4) required substantial cash payments to the Kent Island Volunteer Fire Department and to the County; and (5) froze the laws and regulations governing the use, density or intensity of the development as of the date of the execution of the Agreement for the duration of the Agreement. The DRRA was recorded on 18 September 2002.

## B. Circuit Court Proceedings

The Conservation Association filed a Complaint for Declaratory and Injunctive Relief with the Circuit Court for Queen Anne's County on 8 October 2002, asserting an array of legal defects with regard to the DRRA. The Conservation Association requested a declaration that the DRRA was an illegal contract violative of a prohibition against conditional use zoning; that the DRRA was illegal contract zoning; that the DRRA was violative of constitutional due process because it created preferences for Hovnanian's project denied to other developers under the law; that the process leading to approval and execution of the DRRA violated the hearing requirements of § 13.01(j)(2) of Article 66B because certain provisions were inserted in the final draft which did not appear in the earlier versions that were the subject of public hearings; and, that the DRRA violated the County's existing moratorium on new development and, thus, rendered the moratorium a special law contrary to Article III, § 33 of the Maryland Constitution.

Hovnanian and the County Commissioners filed a Motion to Dismiss, under Maryland Rule 2–322, arguing, among other things, that the Conservation Association failed to exhaust available administrative remedies by not appealing to the Board of Appeals for Queen Anne County. After briefing and oral argument on 25 February 2003, the Circuit Court dismissed the Complaint, reasoning preeminently that the Conservation Association should have appealed the County Commissioners' approval and execution of the DRRA to the

County Board of Appeals ("the Board"), as required by Maryland Code (1957, 2003 Repl.Vol.), Article 66B § 4.07 and QACC §§ 18–1–174 through 18–1–180. The Board is to "hear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by an administrative officer in the enforcement of [Art. 66B] or of any ordinance adopted under this article." Md.Code (1957, 2003 Repl.Vol.), Art. 66B § 4.07(d)(1). Similarly, QACC § 18–1–175(a) provides that "the Board shall have the power to hear and decide appeals where it is alleged that . . . there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of Article 66B of the Annotated Code of Maryland or this subtitle . . . ."

The Circuit Court concluded that, when the County Commissioners approved and executed the DRRA, it acted collectively as an "administrative officer," i.e., as the "public principal" contemplated in the DRRA enabling legislation, defined as "the governmental entity of a jurisdiction that has been granted the authority to enter agreements under . . . this section." Md.Code (1957, 2003 Repl.Vol.), Article 66B § 13.01(a)(4). The administrative process of appealing to the Board, therefore, was available to the Conservation Association and a necessary step in the process of seeking redress on its claims.

The Circuit Court also considered Article 66B, § 4.08, which provides for immediate judicial review by a circuit court of a "zoning action of a local legislative body." Md.Code (1957, 2003 Repl.Vol.), Article 66B § 4.08(a)(1). The court concluded, however, that because the County Commissioners had acted administratively as a statutory "public principal" when it executed the DRRA, it did not act as a "local legislative body," a prerequisite to immediate judicial review under Article 66B, § 4.08.

Alternatively, it seems, the court also concluded that "if no distinction is made between the exercise of the county's powers as a governing body and its powers as public principal, i.e.,

it is viewed as 'a local legislative body' in both instances, the result would be direct review by this Court under § 4.08." In other words, Article 66B, § 13.01, in the Circuit Court's view, might countenance different methods of review. In either event, however, because the Conservation Association sought neither an administrative appeal to the Board of Appeals nor judicial review pursuant to Maryland Rules 7–201 through 7–209, dismissal of the Complaint for Declaratory and Injunctive Relief was proper.

We shall affirm the judgment of the Circuit Court in dismissing this case for Appellants' failure to exhaust their available administrative remedies. The Conservation Association's proper recourse in the present case was an administrative appeal to the Board of Appeals under Article 66B, § 4.07 and, if aggrieved by the Board of Appeals's final action, a petition for judicial review in the Circuit Court.

## III.

As alluded to earlier, Queen Anne's County is a Code home rule county within the purview of Article 25B of the Maryland Code. Article 66B of the Maryland Code, governing land use, applies to Code counties and requires the legislative bodies of such counties to "provide for the appointment of a board of appeals." Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 4.07(a)(1). Each board of appeals possesses expressly delegated general powers, including the power to "[h]ear and decide appeals where it is alleged there is an error in any order, requirement, decision, or determination made by an administrative officer in the enforcement of this article [i.e., Art. 66B] or of any ordinance adopted under this article." Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 4.07(d)(1).

In *Miller v. Pinto,* 305 Md. 396, 403 n. 4, 504 A.2d 1140, 1143 n. 4 (1986), we stated that "the local legislative body in a code county is required to enact local laws authorizing the county's board of appeals to exercise the powers provided by § 4.07(d) of Article 66B." Accordingly, the County Commissioners enacted an ordinance establishing the Board of Ap-

peals of Queen Anne's County. QACC § 18-1-174(a). The establishing ordinance states that "the Board shall have the powers and duties provided in Article 66B of the Annotated Code of Maryland and in this subtitle." QACC § 18-1-174(b). Mirroring the delegation of powers in Article 66B, the County Commissioners granted the Board "the power to hear and decide appeals where it is alleged that: (i) there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of Article 66B of the Annotated Code of Maryland." QACC § 18-1-175(a)(1)(i).

## A. "Administrative Officer" [4]

The Conservation Association contends that the County Commissioners did not act as an "administrative official" because its determination of the DRRA's contents was a fundamentally legislative, rather than an administrative act. In particular, the Conservation Association points to the DRRA's "description of the conditions, terms, restrictions or other requirements determined by the governing body of the local jurisdiction to be necessary to ensure the public health, safety, or welfare," as being the "heart and soul" of the agreement. Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 13.01(f)(ix). The Conservation Association concludes that a determination by the governing body of the local jurisdiction as to what terms, conditions, restrictions or other requirements are necessary to ensure the public health is the "very essence" of the legislative function performed by local elected officials. We disagree with this analysis for two reasons.

■ First, the negotiation of terms protective of public health, safety, or welfare, in a contract entered into by a local government body is a discretionary executive act, not a legislative one. *See Montgomery County v. Revere Nat'l Corp., Inc.,* 341 Md. 366, 390, 671 A.2d 1, 12 (1996) ("When the executive

---

4. Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 4.07(d)(1) uses the term "administrative officer," whereas Queen Anne's County Code § 18-1-175(a)(1)(i) uses the term "administrative official." We view the terms, in this particular context, as interchangeable. *See* 64 Md. Op. Atty. Gen. 349, 356 n. 7 (1979).

branch of the county government, in carrying out the laws and functions of government, enters into a contract, such action constitutes the exercise of executive discretion."). A DRRA is not an ordinance or legislation as those terms are commonly understood; rather, it is a contract whose purpose is to vest rights under zoning laws and regulations, in consideration of enhanced public benefits.

Second, the "public principal," not the "governing body," has the principal responsibility and authority under the DRRA statute to protect the public health, safety, and welfare. Md. Code (1957, 2003 Repl.Vol.), Art. 66B, § 13.01. As we shall explain, the County Commissioners was acting as the "public principal," i.e., acting in its executive and administrative capacities, when it approved and executed the DRRA in this case.

■ As a general matter, "it long has been recognized in Maryland that County Commissioners in much of their functioning act as administrators or in an executive capacity." *City of Bowie v. County Comm'rs for Prince George's County*, 258 Md. 454, 461, 267 A.2d 172, 176 (1970). It is recognized that the protean nature of a board of county commissioners makes it "a unique body" and "somewhat of a hybrid." *Bd. of County Comm'rs of Washington County v. H. Manny Holtz, Inc.*, 60 Md.App. 133, 142, 481 A.2d 513, 518 (1984). We have noted that:

County Commissioners are outgrowths of the old Levy Courts originally established by the Act of 1794, Chapter 53. These courts were composed of the Justices of the Peace of the several counties. Their duties were to meet and to adjust the ordinary and necessary expenses of their counties, and to impose an assessment or rate on property to defray county charges. During the course of the succeeding fifty years the name "County Commissioners" came into existence. It was first recognized in the underlying law of the state in the Constitution of 1851, Article 7, Section 8. In that constitution it was provided that the commissioners should exercise only such powers and duties as the legisla-

ture should from time to time prescribe. When the present Constitution of 1867 was adopted, Article VII, Section I, provided that the power and duties of County Commissioners should be such "as now or may be hereafter prescribed by Law." Until the constitution of 1867, County Commissioners were simply administrative officers in charge of county finances, and taking care of the public roads. After the constitution of 1867 these powers could be broadened by legislative authority.

*Cox v. Bd. of Comm'rs of Anne Arundel County,* 181 Md. 428, 433–34, 31 A.2d 179, 182 (1943) (citations omitted). A board of county commissioners functions as the county government and "is the county body politic. In performing its various functions, it exercises legislative, quasi-legislative, executive, and quasi-judicial authority, sometimes in combination." *H. Manny Holtz,* 60 Md.App. at 144, 481 A.2d at 518. A board of county commissioners can, for example, control county property and roads, enact county ordinances, enforce building codes, borrow money and issue bonds—all "in addition to their authority under Art. 66B of the Maryland Code to enact, administer, and enforce zoning and land use laws." *H. Manny Holtz,* 60 Md.App. at 143, 481 A.2d at 518.

As the present case illustrates, the County Commissioners' particular exercise of its distinct roles in a given situation determines the appeal rights of those affected. We have held, for example, that a statute that authorized appeal to a circuit court from "an assessment made by the county commissioners" did not authorize an appeal from a tax valuation by a board of county commissioners sitting as the county board of control and review. *Chesapeake & Potomac Tel. Co. v. Bd. of County Comm'rs,* 116 Md. 220, 226, 81 A. 520, 522 (1911). Although the same individuals composed the two boards, we reasoned that "their duties are as separate and distinct in the respective capacities in which they act, as if they were different individuals." *Chesapeake & Potomac Tel. Co.,* 116 Md. at 225, 81 A. at 522.

As regards DRRAs in particular, Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 13.01(a)(4) defines the "public

principal" as "the governmental entity of a local jurisdiction that has been granted the authority to enter agreements under" a local ordinance. The County Commissioners in Queen Anne's County exercise the administrative authority of the public principal with respect to DRRAs. QACC § 18–1302.[5] Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 13.01 enables the "public principal" to perform a series of essentially administrative tasks that include: § 13.01(c) (accepting the petition of a property owner or its representatives for a DRRA); § 13.01(d) (holding a hearing on the petition); §§ 13.01(b)(2) and 13.01(e) (executing the DRRA after obtaining the local planning commission's approval); § 13.01(h) (amending the DRRA, if desired, by mutual consent and after public hearing); § 13.01(i) (either terminating the DRRA by mutual consent or, "if essential to ensure the public health, safety, or welfare," suspending or terminating the DRRA after a public hearing). The Queen Anne's County Code, tracking Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 13.01, assigns this same series of administrative functions of the "public principal" to the County Commissioners: QACC § 18–1303 (accepting the petition of a property owner for a DRRA); § 18–1306 (holding a hearing on the petition); §§ 18–1302 and 18–1305 (executing the DRRA after obtaining the local planning commission's approval); §§ 18–1307(a) (amending the DRRA, if desired, by mutual consent and after public hearing); and § 18–1308 (either terminating the DRRA by mutual consent or, if "essential to ensure the public health, safety, welfare," suspending or terminating the DRRA after a public hearing).

Subsection (b) of Article 66B, § 13.01 divides authority for the creation of DRRAs into two parts. Under Article 66B, § 13.01(b)(1), the governing body of a county (in the present case the County Commissioners) is given power to:

---

5. Queen Anne's County Code § 18–1302 provides that "the County Commissioners for Queen Anne's County shall exercise the authority granted by Section 13.01 of Article 66B, Zoning and Planning, of the Annotated Code of Maryland to enter into development rights and responsibility agreements."

"(i) By ordinance, establish procedures and requirements for the consideration and execution of agreements; and

"(ii) Delegate all or part of the authority established under the ordinance to a public principal within the jurisdiction of the governing body."

These powers of the governing body are circumscribed by statutory direction that the powers of the governing body are "Subject to subsections (c) through ($l$) of this section." Under Article 66B, § 13.01(b)(2), a "public principal" is given power to:

"(i) Execute agreements for real property located within the jurisdiction of the governing body with a person having a legal or equitable interest in the real property; and

"(ii) Include a federal, State, or local government or unit as an additional party to the agreement."

The distinction between the legislative powers of the governing body and the executive and administrative powers of the public principal is important. The governing body has no power with respect to the actual operation of the statute. Aside from those matters listed in § 13.01(b)(2) above, the governing body may only and co-extensively with the public principal, "after a public hearing ... suspend or terminate an agreement upon determination that such is 'essential to ensure the public health, safety, or welfare.'" Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 13.01(j). Otherwise, the governing body has no authority with respect to any particular DRRA.

The public principal, on the other hand, is defined as "the governmental entity of a jurisdiction that has been granted the authority to enter agreements under ... this section." Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 13.01(a)(5). Sole power to negotiate, execute, and enforce agreements lies with the public principal. Petitions to enter into agreements are made to the public principal; and the required public hearing is conducted by the public principal. In any particular case, the only limitations on the public principal's authority is to follow general procedures adopted by the governing body and a requirement—unrelated to the governing body or its legisla-

tive functions—that all agreements be determined by the Planning Commission to be "consistent with the plan of the jurisdiction." Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 13.01(e). Further evidence of the distinction, and the autonomy of the public principal, lies in Article 66B, § 13.01(m) which states, "this section does not require the adoption of an ordinance by a governing body." This can only be read as applying to agreements, because an earlier provision, specifically requires that procedures be established "by ordinance." Md.Code (1957, 2003 Repl.Vol.), Art. 66B, § 13.01(b)(1)(i)

▮▮▮ The County Commissioners in the present case successively wore two different hats and performed a legislative action followed by an administrative/executive action. The test to determine when action is legislative and when executive or administrative is "whether the [action] is one making a new law—an enactment of general application prescribing a new plan or policy—or is one which merely looks to or facilitates the administration, execution or implementation of a law already in force and effect." *City of Bowie,* 258 Md. at 463–64, 267 A.2d at 177 (citations omitted). Initially, the County Commissioners acted legislatively, as a governing body under Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 13.01(b)(1), by authorizing DRRAs in Queen Anne's County through enactment of Subtitle 13 of the Land Use and Development Title of the Queen Anne's County Code. In enacting Subtitle 13, the County Commissioners reserved to themselves the role of the "public principal" under Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 13.01, with its concomitant powers to conduct hearings on, enter into, execute, and enforce DRRAs. Subsequently, the County Commissioners signed off on the DRRA in its administrative and executive role as the "public principal." The County Commissioners' approval was the act of an "administrative officer" or "administrative official" under the Maryland and County Codes, respectively, because "the term 'administrative official' is most reasonably read as embracing whatever administrative mechanism a local jurisdiction in Maryland sets up to enforce its planning and zoning laws and ordinances, including a multi-

member body. . . ." *See Wharf at Handy's Point, Inc. v. Dep't of Natural Res.,* 92 Md.App. 659, 672, 610 A.2d 314, 320 (1992) (holding that the term "an administrative official" in § 4.07(d) includes the Kent County Planning Commission) (citation omitted); *Howard Research & Dev. Corp. v. Concerned Citizens for Columbia Concept,* 297 Md. 357, 366–67, 466 A.2d 31, 35–36 (1983) (holding that a five-member Planning Board constituted the "administrative official" whose decisions were subject to appeal to the Howard County Board of Appeals); *see also* Md.Code (1957, 2001 Repl.Vol.), Art. 1, § 8 (stating the rule of construction when interpreting the Code is that "the singular always includes the plural, and vice versa, except where such construction would be unreasonable.").

## B. The Scope of the Board's Authority

The Conservation Association also contends that QACC § 18–1–175 contemplates that aggrieved persons may appeal to the Board only from decisions of "the Planning Director or any other employee of the Department of Planning and Zoning." QACC § 18–1–179(c). This kind of limiting argument was raised to no avail by the appellees in *Wharf at Handy's Point.* We agree with the Court of Special Appeals reasoning in *Wharf at Handy's Point* and apply it to the present case. *Wharf at Handy's Point,* 92 Md.App. at 670–73, 610 A.2d at 319–20.

 In *Wharf at Handy's Point,* an issue arose as to whether the term "administrative official" included the Kent County Planning Commission, within the meaning of the statute requiring county boards of appeals to hear and decide appeals from administrative officials. Pursuant to the authority granted to it in Article 66B, § 4.07(d), the County Commissioners of Kent County provided in its zoning ordinance that the Board of Appeals shall have the power "[t]o hear and decide appeals of any decision or determinations made by the Administrator in the enforcement and administration of this Ordinance." Ordinance, Art. IX, § 2.1. The zoning ordinance defined the "Administrator" as "[t]he Zoning Administrator of Kent County." Appellees there argued that "an administra-

tive official" in Article 66B, § 4.07(d) should not be construed to include the Kent County Planning Commission. The Court of Special Appeals quoted the Attorney General's conclusion that "on the whole, we think the term 'administrative official' is most reasonably read as embracing whatever administrative mechanism a local jurisdiction in Maryland sets up to enforce its planning and zoning laws and ordinances, including a multi-member body such as a local planning commission." *Wharf at Handy's Point*, 92 Md.App. at 672, 610 A.2d at 320 (quoting 64 Op. Atty Gen. 349, 355 n. 4 (1979)). The intermediate appellate court concluded that "regardless of what was intended by the County Commissioners" in the local ordinance, the more broadly drafted Article 66B, § 4.07(d) took precedence, and invested the local board of appeals with authority to hear appeals from the Kent County Planning Commission, as well as the Zoning Administrator. *Wharf at Handy's Point*, 92 Md.App. at 670–73, 610 A.2d at 319–20. Furthermore, the Court of Special Appeals's interpretation of the overriding authority of Article 66B, § 4.07(d), is consistent with the 1971 amendment of Article 66B, § 4.07.1971 Md. Laws, Chap. 793. The 1971 revision of Article 66B, § 4.07 broadened its scope, empowering local boards "to act on matters arising out of the enforcement of any part of Article 66B or an ordinance passed under any of the subtitles of Article 66B." 64 Op. Att'y Gen. 349, 351 (1979). In addition, our conclusion that Article 66B, § 4.07 overrides the reference in QACC § 18-1-175 to "the Planning Director" is consistent with the established principle that in cases of conflict between local and State enactments, the State statute "must prevail." *Boulden v. Mayor and Comm'rs of Town of Elkton*, 311 Md. 411, 415, 535 A.2d 477, 479 (1988) (finding that Article 66B, § 4.08 overrode local ordinance limiting right of appeal from the board of appeals). The Board has the general power to decide an appeal involving an "error in any order, requirement, decision or determination made by an administrative official." QACC § 18-1-175(a)(1)(i). The Board's general powers refer to "an administrative official" (not limited to the Planning Director) and

encompass the entirety of Article 66B (not simply the Planning Director's role in the administration of zoning issues).

Accordingly, under the authority of Article 66B, § 4.07, the Board is the proper body to hear and decide in the first instance an appeal from the County Commissioner's administrative/executive actions in negotiating and executing the DRRA with Hovnanian. The Conservation Association's failure to avail itself of this appeal to the Board means that the Conservation Association failed to exhaust its administrative remedies. As exclusive or primary administrative remedies must be exhausted before judicial relief is sought, the present litigation could not be maintained and must be dismissed. *See Brown v. Fire and Police Employees' Retirement System*, 375 Md. 661, 669, 826 A.2d 525, 530 (2003) ("The exhaustion doctrine enforces the notion that an administrative agency should have the opportunity to exercise its expertise first to resolve an issue.").

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**