42 A.3d 40

**MARYLAND BOARD OF PUBLIC WORKS, et al.**

v.

**K. HOVNANIAN'S FOUR SEASONS AT KENT ISLAND, LLC.**

**No. 67, Sept. Term, 2011.**

Court of Appeals of Maryland.

April 23, 2012.

Adam D. Snyder, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, John B. Howard, Jr., Deputy Atty. Gen.; Baltimore, MD), on brief, for appellants.

C. Daniel Saunders (Cristina Harding Landskroener, Chestertown, MD), on brief, for appellants.

John H. Zink, III (Venable LLP, Towson, MD); Charles R. Schaller, Jr. of Linowes and Blocher, LLP, Annapolis, MD;

Joseph A. Stevens (Stevens & McCann, LLC, Centreville, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and ALAN M. WILNER (Retired, specially assigned), JJ.

ALAN M. WILNER (Retired, specially assigned), J.

This is an action for judicial review to determine whether the Maryland Board of Public Works—a body created by the Maryland Constitution and consisting of the Governor, the State Comptroller, and the State Treasurer (the Board)—committed legal error in denying, by a two-to-one vote, respondent's application for a license to fill and dredge on certain State wetlands. The Circuit Court for Queen Anne's County concluded that the Board did err, by basing its decision on considerations outside the lawful scope of its discretion. The court reversed the Board's negative decision and remanded the matter to the Board for further proceedings in conformance with the findings and principles set forth in the court's judgment and accompanying memorandum.

The Board and several individuals who had appeared at the Board's informational hearing in opposition to the project appealed, and we granted *certiorari* prior to any significant proceedings in the Court of Special Appeals. We agree with most of the findings and holdings of the Circuit Court and, in particular, with its ultimate conclusion that the Board, through its majority vote, committed legal error by basing its decision on factors outside the scope of its authority and discretion. We shall vacate the Circuit Court judgment and remand the case to that court with instructions to vacate the Board's decision and remand the case to the Board for further proceedings in conformance with this Court's opinion.

## BACKGROUND

### Regulation of Wetlands In General

The Maryland Code does not define the broad term "wetlands," and definitions of it seem to vary. The State Depart-

ment of the Environment (DOE) has noted, with seeming approval, the definitional characteristics articulated by Ralph W. Tiner and David G. Burke, *Wetlands of Maryland* (1995)— areas that hold water for significant periods during the year characterized by anaerobic conditions favoring the growth of specific plant species and the formation of specific soil types. *See An Overview of Wetlands and Water Resources of Maryland,* prepared by DOE for the Maryland Wetland Conservation Group (Jan.2000). Wetlands may be permanently flooded by shallow water, permanently saturated by groundwater, or periodically inundated or saturated for varying periods. *Id.*

Being a coastal State blessed with a large portion of one of the world's great estuaries—the Chesapeake Bay—as well as several coastal bays and numerous tributaries, Maryland has an abundance of wetlands. According to the U.S. Fish and Wildlife National Wetlands Inventory, 9.5% of the State's land surface—some 600,000 acres—is covered by vegetated wetlands. *See id.* All are subject to some form of State regulation.

For purposes of regulation, the Code defines three types of wetlands—State, private, and non-tidal. Md.Code, § 16–101(*o* ) of the Environment Article (ENV) defines State wetlands as "any land under the navigable waters of the State below the mean tide, affected by the regular rise and fall of the tide" except wetlands of that category that have been transferred by the State by valid grant, lease, patent, or grant confirmed by Art. 5 of the Md. Declaration of Rights. ENV § 16–101(k) defines private wetlands as "any land not considered 'State wetland' bordering on or lying beneath tidal waters, which is subject to regular or periodic tidal action and supports aquatic growth," including wetlands transferred by the State by valid grant, lease, patent, or grant confirmed by Article 5 of the Declaration of Rights.[1] State and private

---

1. By virtue of its succession, upon Independence from England, to the rights of the colonial Proprietor under the 1632 Charter granted by King Charles I to Caecilius Calvert and his heirs, the State of Maryland owned all of the land within the geographic boundaries of the State

wetlands, under those definitions, are tidal. Non-tidal wetland is defined in ENV § 5–901(i), the important aspect of which, for our purposes, is that is does not include tidal wetlands regulated under Title 16 of the Article.

Comprehensive regulation of the State's wetlands, both State-owned and in private hands, came about with the enactment of the Wetlands Act of 1970, which this Court described in *Bd. of Pub. Works v. Larmar Corp.*, 262 Md. 24, 277 A.2d 427 (1971) and *Hirsch v. Md. Dep't of Nat. Resources*, 288 Md. 95, 416 A.2d 10 (1980). The regulation was prompted by legislative concern over the loss or despoliation of the wetlands, which the General Assembly considered an important natural resource, as the result of unregulated dredging, dumping, filling, and like activities. That concern and the statement of public policy regarding the need to preserve the wetlands and prevent further loss or despoliation was expressed in the Code and now appears in ENV § 16–102.[2]

As we pointed out in *Hirsch*, 288 Md. at 100–01, 416 A.2d at 12–13, the Act established a bipartite regulatory scheme, one part for State-owned wetlands and one for private wetlands. Activities on State wetlands always were subject to *being* regulated, precisely because the State owned them. What the 1970 Act did was to put in place a scheme for actually regulating the filling and dredging of State wetlands and, for the first time, to regulate activity on private wetlands. The effect of the Act was to preclude riparian owners from freely

---

lying under navigable water. During the colonial period, the Proprietor, and for 86 years thereafter, the State, granted private individuals patents to some of that land, which is what created private wetlands. *See Bd. of Pub. Works v. Larmar Corp., supra,* 262 Md. 24, 47, 277 A.2d 427, 437; also the brief summary in *Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 315, n. 9, 407 A.2d 738, 744, n. 9 (1979) and cases cited there; *cf. PPL Montana, LLC v. Montana,* 565 U.S. ——, 132 S.Ct. 1215, 182 L.Ed.2d 77 (2012).

**2.** Initially, the Department of Natural Resources was given primary responsibility for identifying and mapping the State and private wetlands and, except for the licensing authority of the Board, regulating activities on wetlands. When DOE was created in 1987, most of that responsibility was statutorily shifted to the new agency.

exercising rights on adjacent wetlands that, under common law or pre-existing statutory law, they previously could exercise. In *Larmar*, the Court observed that, under an 1862 statute, a riparian owner "had the right to make artificial landfill in navigable waters in front of his shore, limited only to the extent that he could not obstruct navigation" and that the 1970 Act unqualifiedly repealed that right. *Larmar, supra*, 262 Md. at 44, 277 A.2d at 436.

The nature and scope of the regulatory scheme differ based on the type of wetland involved. Certain activities on non-tidal or privately owned wetlands require a *permit* from DOE. *See* ENV §§ 5–905, 5–906, and 16–307. Activities on State wetlands that fall within the definition of dredging or filling (ENV § 16–101(e) and (f)) require a *license* from the Board of Public Works. ENV § 16–202. We are dealing here with the latter, so, except for purposes of comparison, when relevant, our focus will be on the statutes and regulations governing the licensing procedure relating to those kinds of activity on State wetlands.

### *Regulation of State Wetlands*

Before considering the actual procedures, it is important to note some general propositions that govern those procedures. First, the requirement of a license and the Board's authority to issue one are entirely statutory. Though implemented to a large extent by regulations adopted either by the Board (*see* COMAR 23.02.04) or by DOE (*see* COMAR 26.24), the nature of the activities on State wetlands that *require* a license, the authority of the Board to *issue* a license, the nature of a license, some of the conditions which may be attached to it, and the procedures and basic ground rules for the issuance of a license are provided by the statutes in ENV, title 16, subtitles 1 and 2. Except that those aspects of regulation must comport with basic due process, they are not Constitutionally mandated and are not within any inherent power of the Board. The Legislature, if it wished, could have delegated that authority to any State agency.

Some of the applicable regulations, unfortunately, are not easy to follow and interpret, especially when read in conjunction with the statutes. The Board regulations and the DOE regulations overlap to some degree, and, in part through cross-references to each other and to the statutes, they appear to contain exceptions to exceptions and other facial ambiguities. Some parts of the license procedure are dealt with in the Board's regulations and other parts in the DOE regulations, requiring one to bounce back and forth between them to see the whole picture. Persons who deal regularly with those regulations may have no problem understanding these intricacies, but, for the uninitiated, they are a challenge.

ENV § 16–202(a) precludes a person from dredging or filling on State wetlands without a license. "Dredging" is defined in § 16–101(e) as "the removal or displacement by means of soil, sand, gravel, shells, or other material, whether or not of intrinsic value, from any State or private wetlands." The term "filling" is defined in § 16–101(f). It is a longer definition because it lists the things it expressly includes and excludes, but generally it means "[t]he displacement of navigable water by the depositing into State or private wetlands of soil, sand, gravel, shells, or other materials" or "[t]he artificial alteration of navigable water levels by any physical structure, drainage ditch, or otherwise." That is the extent of the Board's authority to issue, or deny, a license.[3]

The term "license" is not defined in either the general definitions applicable to the Environment Article as a whole (§ 1–101) or in the definitions applicable to title 16 (§ 16–101). The only definition appears in the regulations. COMAR

---

**3.** COMAR 23.02.04.04B appears, at least facially, to broaden the preclusion, and thus the requirement of a license. It provides that a person may not, without a license, dredge; fill; construct, reconstruct, or repair structures, "[c]onduct certain other activities over, on, in, or under State tidal wetlands"; or "[a]lter State tidal wetlands." *See* also COMAR 23.02.04.01A and 02A. Because the parties agree that what Hovnanian applied to do constituted dredging or filling, we need not address whether, to the extent that those regulations may purport to require a license for activities that would not fall within the definitions of dredging or filling, they exceed the Board's statutory authority.

23.02.04.01A defines a wetland license as "the authorization issued by the Board of Public Works under Environment Article, Title 16 . . . for the performance of dredging, filling, the construction of structures, or the conduct of certain other activities on land and waters of the State which are tidal wetlands." A license, it continues, "authorizes construction during a specified period and sanctions the licensed use of State lands and waters" but "does not convey ownership of lands below the mean high water line or tidal waters of the State or the affected air space or diminish the full and free use and enjoyment of the tidal waters of the State by the public."

In that latter regard, paragraph 01D of the regulation makes clear that the regulations governing State wetland licenses do not address the full range of fiduciary and proprietary responsibilities of the Board relating to the private use of State wetlands, "which may be considered by the Board of Public Works through easement, lease, quitclaim deed, or other instrument to protect the State's interests or to convey an interest in State wetlands."

COMAR 23.02.04.05 provides for three types of license—a general license, an individual license, and an expedited license. A general license is a standing authorization, subject to periodic review and readoption by the Board, for any of the eleven "recurrent or minimally disruptive activities" listed in paragraph 05A(3) of the regulation. According to the regulation, DOE determines the applicant's qualifications for a general license and actually forwards the license to a qualified applicant. *See* § .04.05A(3). COMAR 26.24.02.04C., which is a regulation of DOE, provides that an authorization under a general license expires three years after it is issued.

An individual license is required for construction or activities not listed in COMAR 23.02.04.02A,[4] or construction or

---

4. COMAR 23.02.04.02 describes the scope of the regulations in chapter .04. It states that the chapter applies to all dredging, filling, or altering of State wetlands and to the construction, reconstruction, or repair of structures on State wetlands except ten listed activities. We assume

activity subject to delegation to DOE under COMAR 23.02.04.04. An expedited license is limited to cases of emergency conditions or undue hardship. The record does not reveal what kind of license was at issue here, but, as none of the parties have made that an issue in the case, we shall assume that it is not one. We note only that there is no indication of any emergency or undue hardship or that the authorizations would have expired after three years.

With exceptions not relevant here, only a person with a riparian interest in upland adjacent to the State wetlands or that person's agent may apply for a license. COMAR 26.24.02.02A. The application is made to DOE, which evaluates it in light of 19 criteria set forth in COMAR 26.24.02.03. Those criteria include, among other things (i) ecological, developmental, recreational, and aesthetic values of tidal wetlands in order to preserve them and prevent their despoliation and loss, (ii) the proprietary interests of the Board over State wetlands, and (iii) the degree to which dredging and filling activities can be avoided or minimized, will alter or destroy tidal wetlands, are consistent with Federal, State, and local land use plans, and will provide facilities for the handling of storm water runoff and sanitary wastes.

In determining whether to grant a *permit* to conduct regulated activity on *private* wetlands, DOE is required by statute to provide both an opportunity for an informational hearing before making an initial decision on the application, and a contested case hearing, if one is timely requested, following notice of the initial decision. *See* ENV §§ 16–307(d) and 5–204. That is not the case, however, with respect to its review of an application for a license to dredge or fill *State* wetlands. The only statutory provision with respect to the role of DOE in that regard is ENV § 16–202(f), which provides that (1) the Secretary shall assist the Board in determining whether to issue a license to dredge or fill State wetlands, and (2) after consultation with interested Federal, State, and local units, the

that the reference in COMAR 23.02.04.05B to "those listed in Regulation .02A of this chapter" is intended to refer to the exceptions in .02A.

Department shall issue a public notice, hold any requested hearing, take any evidence the Secretary deems advisable, and submit a report indicating whether the license should be granted and, if so what if any terms, conditions, and consideration should be required.

That statutory requirement is amplified by both Board and DOE regulations. COMAR 23.02.04.06A., a Board regulation, requires DOE to hold an informational hearing, either on written request or its own determination that a hearing is in the public interest. Although the informational hearing is not a contested case hearing, the applicant and other interested persons must be given the opportunity to present evidence and argument. Questions may be asked, but cross-examination is not allowed. *Id.*

After the informational hearing and consideration of the 19 *environmental* criteria set forth in COMAR 26.24.02.03, DOE forwards its Report and recommendations. The Report and recommendations must be based on the five *legal* criteria stated in COMAR 23.02.04.07—legal requirements, information compiled during site visits, consultations with governmental units, evidence admitted during the public informational hearing, and comments submitted by public and governmental units. The Report and recommendations must state whether the license should be granted, any terms and conditions to which it should be subject, and all relevant findings and documentation. *Id.*

Although ENV § 16–202(f) does not specify to whom the DOE Report and Recommendation are submitted, they are, in fact, submitted to the Wetlands Administrator. There is nothing in the Code regarding even the existence, much less the role, of that official. The functions of the Wetlands Administrator are set forth in the Board's regulations, in particular COMAR 23.02.04.08 and .09.[5] The Administrator

---

5. When the Wetlands Act was first enacted in 1970, it simply authorized the Board to issue licenses for dredging and filling on State wetlands after a hearing in the local subdivision, but did not indicate who was to conduct that hearing. Concerned about the burden of having to con-

receives the DOE Report and recommendations, evaluates it, and makes an independent recommendation to the Board. COMAR 23.02.04.08 provides for two situations—Concurrence Cases and Extraordinary Cases.

Concurrence cases are those in which the Administrator concurs in the DOE recommendation. They are cases which:

"(1) Are within the rights of a riparian owner;

(2) Are recommended for approval by the Department;

(3) Are recommended for approval by the Administrator under the same terms and conditions, if any, specified in the Department's report and recommendation; *and*

(4) *Have no substantial or long term adverse effect on State wetlands.*"

COMAR 23.02.04.08A. (Emphasis added).

Extraordinary cases are those in which (1) a public informational hearing is held, (2) the recommendations of the Department and the Administrator are inconsistent; (3) denial of a license is recommended by the Department or the Administrator; (4) a proposed structure or activity involves substantial destruction or loss of State wetlands; (5) a proposed structure or activity involves substantial public interest or public works; (6) the case involves a recommendation that compensation be assessed or that a bond be posted; (7) request has been made for release of a bond; *or* (8) substantial objection to a pro-

---

duct hundreds of hearings itself, the Board sought the advice of the Attorney General, who construed the law as requiring the Secretary of Natural Resources to conduct the hearing, noting that "[i]t is illogical and inconsistent for the Board of Public Works to be required to hold a hearing after the Secretary of Natural Resources [now the Secretary of DOE] has already done so for the same purpose." *See* 55 Op. Atty. Gen. 350, 351 (1970). The Attorney General opined, however, that the Board could designate *its* Secretary to join with the Secretary of Natural Resources in holding the hearing, but that the Board could not delegate the ultimate responsibility for approval or disapproval of license applications. The Board did not follow that advice and, instead, appointed a Wetlands Administrator as its agent to receive applications, conduct hearings, and make recommendations. As noted *supra* in text, through regulations adopted by the Board, that structure has changed somewhat.

posed structure or activity has been made involving a request for personal appearance before the Board. (Emphasis added). COMAR 23.02.04.08B.

The Board is not required to hold a hearing as such. It may, but is not required to, permit persons to appear before the Board. *See* COMAR 23.02.04.09B ("The Board reserves the right to decline to hear personal appearance testimony based upon the merits of the information before it"). The Board's action is guided by both statute and regulations. ENV § 16–202(g)(1) [which was § 16–202(c)(1) when the Board acted in this case] provides:

"Upon receipt of a report by the Secretary [of DOE], the Board shall decide if issuance of the license is in the best interest of the State, taking into account the varying ecological, economic, developmental, recreational, and aesthetic values each application presents. If the Board decides to issue the license, the issuance of the license shall be for consideration and on terms and conditions the Board determines. Every license shall be in writing."

COMAR 23.02.04.10 provides:

"The Board shall approve, conditionally approve, or deny any individual or expedited license sufficient to the attainment of riparian rights the Board determines to be reasonable in accordance with the best interests of the State. In making its determination with respect to each application, the Board shall consider the recommendations of the Department and the Administrator, public testimony at any hearing, and information available in the public record, and shall take into account the varying ecological, economic, developmental, recreational, and aesthetic values to preserve the wetlands and prevent their despoliation and destruction."

Finally, in terms of procedure, ENV § 16–204, as it read when the Board acted in this case, when the action for judicial review was filed, and when the hearing in that action was conducted, provided that "[a]ny party to the proceedings aggrieved by the decision of the Board, may petition the

circuit court of the county where the land is located within 30 days after receiving the decision. The appeal shall be heard on the record compiled before the Board." [6]

## Proceedings In This Case

The project that led to this proceeding has been before this Court twice before. *See Queen Anne's Conservation v. County Comm.*, 382 Md. 306, 855 A.2d 325 (2004) and *Foley v. Hovnanian*, 410 Md. 128, 978 A.2d 222 (2009). It involves the proposed construction of a mixed-use adult community on Kent Island, in Queen Anne's County, to be known as Four Seasons at Kent Island. The project envisions 1,350 single and multifamily dwelling units, an assisted living facility, and related community and recreational facilities, to be erected on two tracts comprising 562 acres that lie on the north side of U.S. Route 50 between the towns of Chester and Stevensville.

As described in the Board's brief, the parcel borders three bodies of tidal water—the Chester River to the east; Macum Creek, a tributary of the Chester River, also to the east; and Cox Creek, which bisects the property and drains into the Chesapeake Bay. About 92% of the land lies within the 1,000 foot critical area buffer.[7] Although there has been, and remains, considerable opposition to the project, Hovnanian has managed, over the past 13 years, to obtain all of the permits and approvals necessary at this point to proceed, save for a wetlands license.

In October 1999, because the project called for activity on both State and private wetlands, Hovnanian applied to DOE

---

6. In 2009, after the hearing in the Circuit Court was held but before the court's memorandum and judgment were filed, § 16–204 was rewritten to provide certain standing requirements and to add that "[a] contested case hearing may not occur on a decision of the Board in accordance with § 16–202 of this subtitle" and that "[j]udicial review under this section shall be conducted in accordance with Title 1, Subtitle 6 of this article."

7. When we use the term "critical area," we mean the Chesapeake Bay Critical Area as defined in Md.Code, §§ 8–1802(a)(5) and 8–1807 of the Natural Resources Article.

for a license from the Board with respect to the State wetlands and a permit from DOE with respect to the private wetlands. That application was updated at least twice, in September 2000 and November 2001. In its June 2006 Report to the Board, DOE stated that it proposed to issue a permit to directionally drill a water and a sewer line, 80 feet of which would lie beneath private tidal wetlands of Cox Creek. Actual issuance of the permit was stayed, however, pending a decision on the license. It is not an issue in this appeal. We are concerned only with the Board's denial of the license for activity on State wetlands.

As noted, the license application is not in the record. The record reveals, however—and the parties do not dispute—that the license sought in the last amended application was limited to the following four elements that, collectively, directly impact only 9,939 square feet of vegetated State wetlands:

(1) Construction of a 250–foot long by 33–foot wide pile-supported bridge across Cox Creek, to connect the two parcels;

(2) Construction of a storm water management system with 18 outfalls discharging to tidal waters of Cox Creek, Macum Creek, and the Chester River;

(3) Directionally drill a 168–foot 12–inch diameter water line and a 179–foot 12–inch diameter force sewer line beneath State wetlands of Cox Creek; [8] and

(4) Construction of a ten-slip community marina that would be 470 feet long and eight feet wide extending into the Chester River, at the end of which would be a "T" head with four finger piers, six mooring piers, and three cluster-pile dolphins.

Jointly with the U.S. Army Corps of Engineers, DOE held an informational hearing in Queen Anne's County on March 6, 2003. Other than to note that most of the comments were in

---

8. These water and sewer lines apparently were to go under both State and private wetlands and were the subject of the requested permit as well.

opposition to the project, the Department's ultimate Report says little about the hearing. The Wetlands Administrator, in his report, stated that about 50 people were in attendance, 11 spoke, and six of them were in opposition. In its June 2006 Report and Recommendation, DOE noted that, in 2005, an empty and damaged eagle's nest had been discovered near the proposed bridge and that, because, despite its condition, the nest was deemed an active one, Hovnanian had agreed not to do any work in any area that could adversely affect the eagles until it could be determined whether the eagles would return. The Report also noted that Hovnanian had modified its initial plan for the marina pier, reducing it from 72 to 10 slips and reducing the deck at the end of the pier from 1,500 to 600 square feet.

The DOE Report addressed eight issues:

(1) An alternatives analysis—where else could this project be located: DOE seemed to accept that there were no feasible alternative locations.

(2) Avoidance and minimization: DOE noted that Hovnanian had agreed to reduce significantly the size of the proposed community pier.

(3) Historic and archaeological resources: DOE noted that 17 potential historic sites had been identified and that an agreement had been signed to protect those sites.

(4) Threatened and endangered species: DOE noted that the only such species involved the active bald eagle nest and advised that (i) the nest would be monitored for the next three years to see if the eagle pair returned, (ii) no work would be done in the area of the nest, and (iii) if the eagles returned, the project would have to be modified.

(5) Submerged aquatic vegetation: None was found at the Chester River site. Some was found at the Cox Creek and Mecum Creek sites, but the Report did not indicate what, if any, effect any of the four elements would have on that vegetation.

(6) Waterfowl: DOE noted that the Chester River in the area of the project is classified as an Historic Waterfowl

Staging and Concentration Area and that the Department of Natural Resources had recommended two measures to protect that area, both of which were recommended as conditions of the license.

(7) Shellfish: DOE found that there were no oyster beds in the project vicinity.

(8) Stormwater and Flooding: DOE noted that stormwater management plans for Phase I had been reviewed and approved by the Critical Area Commission staff.

In the next section of its Report—Mitigation—DOE reported that a Phase II mitigation plan for both tidal and non-tidal wetland impacts had been developed and approved. The plan provided for mitigation at a 2:1 replacement ratio for the 9,939 square feet of tidal wetland impacted by the proposal, including the footprint of the proposed bridge across Cox Creek and direct impacts from one storm water outfall structure.

Upon these findings, DOE recommended that a wetland license be granted for the four elements, subject to any general conditions imposed by the Board and ten special conditions intended to address the few problems noted.

The Report and Recommendation was received by the Wetlands Administrator on June 12, 2006. It was released for public comment, but no comments were received by the Administrator. At the request of the applicant, consideration of the Report was delayed until March 2007 because of pending litigation. On April 11, 2007, the Administrator filed his Report, his ultimate conclusion being that "[b]ased on the favorable dispositions of the State and federal reviewing agencies, and the recommendations and conditions set forth below, issuance of the wetlands license is recommended."

The Administrator's Report added comments on two matters not discussed in the DOE Report. One dealt with the economic and tax benefits from the project. Based on data supplied by the applicant, the Administrator estimated that, once built out, the economic benefits to the State would be $34.7 million in goods and services on an annual basis, $440 million in retail sales and services over a 20–year period, and

100 permanent full-time jobs. Estimated tax revenues from the project were $114 million over 20 years and $3.8 million in property taxes once built out. The Administrator estimated a positive net fiscal impact over 20 years of $88 million.

The second added comment concerned the impact of the project on *non-tidal* wetlands. The Administrator noted that the project would permanently impact 8,189 square feet of scrub-shrub/emergent non-tidal wetlands and temporarily impact 1,968 square feet of such wetlands. In addition, project activities would permanently impact 13,508 square feet of regulated non-tidal wetlands buffer and temporarily impact 3,766 square feet of such buffer. Mitigation requirements would be satisfied by the creation of 39,000 square feet of forested wetlands and 5,200 square feet of emergent/shrub-scrub wetlands located on site and adjacent to Cox Creek. With respect to tidal wetlands, the Administrator concurred in DOE's recommendation that the license be conditioned on the establishment of 19,878 square feet of tidal marsh within one growing season subsequent to the commencement of any construction—that being the 2:1 replacement ratio recommended by DOE.

The matter first came before the Board on May 9, 2007. Notwithstanding that the application met all of the criteria for a concurrence case as set forth in COMAR 23.02.04.08A, *see supra*, the Board classified it as an extraordinary case because a public informational hearing was to be held.

The first speaker on May 9 was the Wetlands Administrator, Doldon Moore. In describing the impact of the four elements for which a license was requested, he observed that:

(1) With respect to the directional drill, there would be no adverse impact on tidal water bodies or vegetative tidal wetlands. That was because directional drill bore methods disturb the soil surface only at the entrance and exit holes, and both of them were located outside the 100–foot critical area buffer;

(2) With respect to the shading of wetlands by the proposed bridge and the single direct impact of the storm

water structure, which comprised most or all of the 9,939 square feet of impact, mitigation at a 2:1 ratio would be required. In addition, Hovnanian had implemented an invasive species control program and continues to restore and enhance degraded tidal wetlands located on the site and a tidal pond adjacent to the Chester River;

(3) The project site was located in a smart growth and State priority funding area, that it was granted critical areas growth allocation, and that 40 percent of the land would remain in green space; and

(4) With respect to the eagle's nest, in the summer/fall of 2005, a storm blew the nest from the tree, the eagles had not returned in 2006 or 2007, but the site would be monitored for three years to determine its viability.

In response to questions from the Governor regarding the 18 storm water outfalls into the Chester River and Cox and Macum Creeks, Mr. Moore advised that because the runoff would be pre-treated, there would be a minimum of ten percent less nutrients running off the property into tidal waters than is currently the case, which complied with critical area requirements. A representative from Hovnanian amplified that response later, pointing out that, in earlier times, storm water management, to the extent it existed, relied on large holding ponds to collect and filter the runoff, but that the current technology called for a larger number of smaller ponds, closer to the site of the runoff, supplemented by sand, gravel, and "rip rap" further away. The 18 small outfalls, rather than one large one, reflected the current approach.

The concern that ultimately led to the negative vote by the Governor and the Comptroller was first raised by the Comptroller, who asked the Secretary of DOE, Shari Wilson, whether, from an environmental standpoint, this was a good project to have at that location. Ms. Wilson responded that there were two aspects to the question. As to the "narrower aspect" that was then before the Board, she said that, from an environmental standpoint, "the project meets current tidal wetlands licensing requirements." She added that, in terms of

the larger question, this was not a preferable site for such a large project, but again confirmed that, "in terms of the application for the license that's before you, the project meets the requirements" of existing law and that there was "nothing particularly unusual about this project as opposed to others."

The Comptroller accepted the Secretary's explanation but, though recognizing that the only issue was the license for the four minor impacts, he stated that it was important to "take a step back" and ask whether it was in the best interest of the State "to allow the kind of development that's killing the Bay to move forward." He also expressed concern that there was "some kind of a gag order floating around" that prohibited Queen Anne's County Commissioners from commenting on the project. We shall address that point later; suffice it to say at this point that there was no such gag order, and the Queen Anne's County Commissioners were not precluded from expressing their opinions. Ms. Wilson responded that DOE's contact with local officials had been through water and sewer planning, but that other agencies had been working with them on the critical area issues.

In response to further questions, a representative from the Critical Areas Commission for the Chesapeake and Atlantic Coastal Bays noted that about 60 percent of the land was in the critical area, that one of the critical area requirements for a project was that there be at least a ten percent reduction in pollutant runoff, and that requirement was met in this case. A representative of Hovnanian, Nancy Slepicka, emphasized that point—that, in accordance with the critical area law, the county had designated the location as a growth area because it was near major roads, existing water and sewer facilities, and existing developments, and that the county also had designated that location as one of its priority funding areas. She noted that the county had taken at least ten different votes over the years approving the project.

The Comptroller noted again his concern that the county commissioners were unable to comment on the proposal. Counsel for Hovnanian, John Zink, explained that, in 2002,

Hovnanian and Queen Anne's County entered into a Development Rights and Responsibilities Agreement (DRRA) which, in return for certain substantial benefits to the county, froze all of the then-existing county development laws and regulations with respect to the project, so that it could proceed without fear that those laws or regulations might be changed mid-stream.[9] After that agreement was signed, new county commissioners took office and, in the view of Hovnanian, breached the DRRA by interfering with permits and approval. Hovnanian filed suit, and, in September 2003, the Circuit Court found the DRRA to be valid and required the county to abide by its commitments. The court reserved jurisdiction to assess, at a later time, damages incurred by Hovnanian by reason of the commissioners' conduct. The county noted an appeal.

In an attempt to resolve all disputes between Hovnanian and the county regarding the project, the parties entered into a settlement agreement in October 2003. As part of that agreement, which was in the record before the Board, the county agreed to dismiss its appeal, comply diligently and in good faith with the Circuit Court judgment, and refrain from "directly or indirectly oppos[ing] or interfer[ing] with any approvals for the development of [the project]." Counsel noted that the county commissioners could terminate the DRRA if Hovnanian violated its provisions, but it had not done so and the current position of the county was that the project could proceed. He said that he was unaware of any "gag order," although he acknowledged that he was "concerned" whether opposition by a county commissioner to the issuance

---

**9.** We traced some of the history of that agreement in *Queen Anne's Conservation v. County Comm., supra,* 382 Md. 306, 855 A.2d 325, which involved an action by opponents to the project for a declaratory judgment that the DRRA was illegal. We affirmed a dismissal of the complaint because the plaintiff failed to exhaust available administrative remedies. Quoting from an amicus brief filed in that case, we noted that DRRA's were authorized by State law and that their central purpose is to vest development rights in the developer in exchange for the dedication and funding of public facilities. *Id.* at 309–10, 855 A.2d at 327.

of a wetland license would violate at least the spirit of the agreement. The Comptroller persisted, that he had contacted four of the five commissioners and they all expressed fear of being sued by Hovnanian.[10]

The next presenter, representing a non-profit organization devoted to environmental improvement, discussed some of the details of the project and confirmed the views of DOE and the Wetlands Administrator that, when built out, it would improve the water quality of the run-off. He was followed by a representative from the State Highway Administration, who advised that the Administration was satisfied with the traffic plan regarding State Route 18 submitted by Hovnanian.

The Treasurer then raised the kind of question with regard to traffic congestion that the Comptroller had raised regarding environmental impact—whether the focus should be just on Route 18 or on U.S. Route 50—a major highway connecting the Eastern and Western Shores of the State—as well. John Porcari, the Secretary of Transportation who was in attendance, responded that he too had been concerned about congestion, both on Route 50 and the Chesapeake Bay Bridges. He said that he had tried to get the local land use authorities in that part of the Eastern Shore to take that into account when approving developments, but the fact was that they were not required to do so. The current requirements, he said, had been met.

The Board then heard from several residents of the area who, without focusing on any of the four elements for which a license was required, expressed opposition to the project as a whole, from an environmental, traffic, and public safety point of view. Richard Altman's position was that "Kent Island is not a suitable place for intensive development." One opponent, Mike Koval, had been a Queen Anne's County Commissioner from 2002 to 2006. He said that he had testified against the project at all of the hearings and averred that the people in the county did not want it. The Board then voted to

---

10. We shall comment on that assertion later in this Opinion.

defer further consideration of the matter until its next meeting on May 23. At the request of the Treasurer, the Board agreed to solicit advice on a number of questions from the Attorney General.

On May 21, 2007—two days before the next Board meeting—the Attorney General's Office responded to the Board's request for advice through two opinions, one dealing with the criteria for designating a priority funding area, and the other dealing with the effect of the settlement agreement on limiting the ability of Queen Anne's County Commissioners to speak out against the project. The opinion dealing with priority funding areas noted that priority funding area was a concept created by the State's "smart growth" law (Md.Code, §§ 5–7B–01 *et seq.* of the State Finance and Procurement Article (SFP)). It pointed out that the law defined seven categories of "growth-related Projects," one of which was areas designated by a county. A county-designated project must meet the criteria in SFP § 5–7B–03 and must be certified to the State Department of Planning, but that the Department had no authority to overrule the county's certification.

In the second opinion, the Attorney General's Office, noting both the DRRA and the settlement agreement, advised that (1) it was legally permissible for the county commissioners to agree to withhold opposition or interference, but (2) such an agreement would affect only *county* approvals and not *State* ones. Thus, the Office concluded that nothing in the DRRA or the settlement agreement could commit the commissioners to a particular position on a State wetlands license.

Responding directly to the question of whether the settlement agreement constituted a "gag order," the opinion declared that it did not, and that, if it did, it would be of doubtful legality. It stated that neither the DRRA nor the settlement agreement "directly prohibits individual County Commissioners from expressing their views concerning the [project] or from appearing before the Board of Public Works and responding to questions." It noted, however, that counsel for Hovnanian had taken a different view and had threatened to

seek indemnification from the county if an individual commissioner were to speak in opposition to the granting of a license, and that, if he pursued such a threat, a court would ultimately have to decide the matter.[11]

The Board reconvened on May 23, 2007. During the two-week interval, the members had visited the site. At the outset of the renewed hearing, the Board acknowledged the two opinions from the Attorney General's Office. They were placed into the record. and the Governor read aloud the conclusions reached in the opinion concerning the effect of the settlement agreement. The discussion turned first to that issue—whether the settlement agreement limited the ability of past and present county commissioners to comment on the issuance of a wetlands license. The Comptroller said that, notwithstanding the opinion of the Attorney General's Office, the Queen Anne's County Attorney had advised the Commissioners not to testify or take any official position on the matter. The Deputy Attorney General, John B. Howard, then advised the Board unequivocally that neither the county nor the Commissioners were precluded from expressing their views on the issuance of a State license. He regarded the concern expressed by the county attorney as a "red herring." The Comptroller expressed his agreement with that view but nonetheless repeated his belief that, at the behest of Hovnanian, the Commissioners "have duct tape wrapped around their mouth." The Treasurer indicated her regret that the Com-

---

11. The Attorney General's Office, before issuing its opinion, had asked counsel for Hovnanian for his views on the issues raised. Mr. Zink responded on May 16 that the settlement agreement was not a "gag order" and did not preclude the county commissioners, past or present, from speaking with other public officials concerning their view on the Four Seasons development, but that, "if an individual Commissioner speaks in opposition to a permit the County is contractually bound to support, we believe K. Hovnanian would be entitled to indemnification." He continued that the Agreement did not prohibit Commissioners from responding to questions posed by the Board of Public Works, but if the question and answer forum is used by a Commissioner to oppose or interfere with approval of the wetland permit, the County would have to indemnify Hovnanian. As noted, the Attorney General's Office disagreed with that view.

missioners had chosen not to appear and suggested that their absence may simply be a matter of political convenience.

The Board's Secretary then referenced the second opinion, regarding priority funding areas. She informed the Board that, when a county designates such an area, the State Department of Planning is permitted to make comments on it, but not to veto it. In this case, she said, the Department of Planning had made no comment on the designation.

The next presenter, at the Board's request, was the Deputy Secretary of DOE, Robert Summers. He pointed out the environmental impact of large developments generally—increased runoff, increased pollution from runoff, treated sewage discharges, atmospheric deposition, and biological degradation of streams and habitats. He also noted that the purpose of priority funding areas is to concentrate that development in the better areas where stormwater and sewage can get state-of-the-art treatment. There were problems with *any* development site close to the Chesapeake Bay. Secretary Wilson agreed that "we would not want to have development occurring along the shoreline," but noted again that the application before the Board "appears to have met all of the state and local land use requirements." In response to a question from the Treasurer, she confirmed that DOE had considered each of the 19 criteria listed in COMAR 16.24.02.03 and found that the impact was such as warranted the Department's recommendation that the license be issued. Her point was that a broader approach than that currently in the law was advisable.

The Comptroller then asked Ms. Wilson directly, for the second time, whether she regarded the project as environmentally sound, and she replied that it was, because it met all the regulations currently in force. In response to a question from the Governor, she noted that, under the regulatory criteria, DOE had to look at the impact on the 9,939 square feet of wetlands, and, given the 2:1 mitigation and other enhancements, the project met the legal requirements and the license should issue. She added that the advisability of placing a

development such as this in that location was reviewed under the critical areas law, which was a separate regulatory scheme. The Secretary of Planning, Richard Hall, noted that the location had received priority funding status by the county in 2001, that the Department of Planning had reviewed it and concluded that it met the legal requirements, which is why the Department did not oppose it. He agreed that some of the regulations should be changed, but the Department had to deal with the law as it is; "[w]e have a limited role with the critical area now."

Attention then turned to the question of evacuating people from Kent Island in the event of a major hurricane, a matter raised by Mr. Altman at the earlier meeting on May 3. John Chew, the Director for Emergency Services for Queen Anne's County, stated that a 1,350–unit development certainly would add to the problem, but that plans had been developed for emergency evacuation of the entire Eastern Shore, including Queen Anne's County. The bottleneck would be getting people across the Chesapeake Bay bridges, which would require that evacuation begin at least three days before the storm actually hit the area. Mr. Chew stated that the National Weather Service "advise[s] us well in advance of times to evacuate."

The Board then heard from proponents of the project. One of them, Linda Friday, was president of the Queen Anne's County Chamber of Commerce. She estimated that the project would have a positive fiscal impact to the county of $135 million over a 20–year period. Douglas Shreve, executive director of a county business group noted that the benefits required under the DRRA were worth $40 million to the county, including an extension of the sewer system and an $8 million contribution to the expansion of the wastewater treatment system. Following their statements, several opponents testified. As before, their focus was on the project as a whole, which they felt was inappropriate for Kent Island, not on its impact on the 9,939 square feet of wetlands. Mr. Zink, counsel for Hovnanian, addressed that point, making clear that the Board was not a planning and zoning body but was

limited to considering the effect of the project on the preservation of the affected wetlands and nothing more.

The Comptroller raised again his belief that Hovnanian had, in effect, gagged the county commissioners. Mr. Zink denied that was the case. He iterated his belief that the settlement agreement precluded the county from opposing the issuance of the license and that, if it did so, it may be liable to indemnify Hovnanian for any loss suffered as a result, but that no commissioner was precluded from appearing before the Board and offering any opinion he or she wished to offer.

The final presenters were Joseph Stevens and John Delaney, on behalf of Hovnanian. Among other things, Mr. Stevens noted that the greatest part of the 9,939 square feet of State wetland affected by the project was the 9,000 square feet that would be shaded by the 250–foot bridge across Cox Creek. That bridge, he asserted, was one that the county itself wanted, to connect the north part of Kent Island to the southeast part in order to avoid the circuitous route that people now needed to travel.

Following these presentations, the Board members announced their individual decisions and the reasons for them. The Governor began by observing that the Board was required to decide whether issuance of the license was in the best interest of the State, taking into account the varying ecological, economic, developmental, recreational, and aesthetic values of the application. He also acknowledged that the Board's authority was limited to whether a wetlands license should be issued at the particular site, and that it is not authorized to order that there be no development at that site. He quoted from the statutory purpose of the Wetlands Law, to prevent the loss or despoliation of the wetlands.

Having said that, the Governor then noted that this would be "the largest development in the history of the critical area law," consuming about one-quarter of the total growth allocation of Queen Anne's County. He then announced his conclusion:

"[G]iven the size of this development, 1,350 units densely crammed into a critical area of the bay, given the lack of assurance that this will not as common sense would tell us do further damage to the wetlands and critical areas of the bay, to say nothing of the public safety concerns which I will leave to the Queen Anne's people to figure out how they justify putting 1,350 senior units in an island that gets cut off in a hurricane one storm, but because of the lack of any assurance because common sense tells us that to cram this many units into this area, I will be voting no on the application for the permit."

The Treasurer disagreed and voted to approve the application. She acknowledged that she would not have chosen to put the development at that location, but observed that it had been approved by the Critical Areas Commission and by the county government, which was the body charged with planning and zoning authority. She pointed out that DOE had found the project in compliance with the 19 criteria that they were obliged to consider, that the Department of Planning had no problem with the county's priority funding determination, that it was within two growth areas, that it met all requirements of the law, and that it would have little negative impact on the wetlands themselves. She agreed that the laws needed to be strengthened but insisted that the instant case had to be decided based on the existing law.

Although briefly echoing the Governor's concern about the environmental impact of the project as a whole on the Chesapeake Bay, Comptroller Franchot voted against the application because he believed that the county commissioners had been bullied and threatened and effectively silenced and that, as a result, the Board had been denied their testimony. That, he concluded, impeded the Board's ability to conduct due diligence on the matter.

Hovnanian sought judicial review of the Board's denial, arguing that the Board misinterpreted its statutory authority and unlawfully extended its scope of review beyond the preservation of State wetlands, that all of the evidence supported

approval of the license, and that the decision should be reversed without remand. In addressing the first issue, the court, in its memorandum, made a number of subsidiary findings, the most relevant of which were:

(1) That proceedings before the Board with respect to such licenses are quasi-legislative, rather than quasi-judicial, in nature and that the standard of judicial review, therefore, was whether the Board acted within its legal boundaries;

(2) That the Board had no statutory (or other) authority to adopt regulations, other than interpretive ones, at least with respect to wetlands licenses and, as a result, the provision in COMAR 23.02.04.10 that, in determining the public interest, the Board must consider the ultimate project had no force other than as an interpretive regulation;

(3) That the Governor's rationale for voting against the application was more a repudiation of the growth allocation made by the county under the critical area law than a more narrow determination that a license would unduly harm the wetlands it actually impacted; and

(4) That the Comptroller's rationale regarding pressure put on the county commissioners had nothing whatever to do with the best interest of the State.

In light of those findings, the court found it unnecessary to reach the evidentiary issue. In its judgment, it declared that the Board, *i.e.,* the Governor and the Comptroller (i) made no assessment of each specific activity for which the wetlands license was sought, as it was required to do, (ii) gave no consideration to the statutory criteria applicable to the proposed activity, (iii) ignored determinations that had been made by coordinate agencies on the basis of applicable statutory criteria, (iv) supplemented the statutory criteria, and (v) applied criteria or standards different from the statutory ones. Upon those findings, it reversed the Board's decision and remanded the case for further proceedings consistent with the court's judgment.

## DISCUSSION

In its brief, the Board raises one very general question—whether the Board acted Constitutionally and within its legal boundaries when it denied the license. In responding affirmatively to that question, it argues (1) that the Board's decision was quasi-legislative rather than quasi-judicial, (2) that, accordingly, the standard of judicial review is whether the Board acted Constitutionally and within its legal boundaries, and (3) that it did so. The individual appellants raise essentially the same general issue. Their view is that the Board is vested with discretionary authority over the issuance of licenses for dredging and filling State wetlands, and that it did not exceed its authority in denying the license in this case.

Hovnanian, of course, has a different view. It contends that the Board's decision was an adjudicatory, quasi-judicial, one and that the standard of judicial review is therefore less deferential. The Board's decision, it argues, must be based on evidence pertaining to the impact of the four elements on the affected wetlands, not on the general environmental impact of the entire project on the ecology of the region, and that, applying the appropriate standard, its decision to deny the license was unsupported by any substantial evidence.[12]

### Nature and Scope of the Board's Authority

In resolving those issues, we need to examine first the nature and scope of the jurisdiction and authority that the Board exercises when dealing with a State wetlands license. Although it had antecedents dating back to 1825, the Board of Public Works in its present form was created in the 1864 Constitution for the purpose of managing the State's investments in various railroad, turnpike, and canal companies until those investments could be sold or otherwise liquidated. Indeed, even to this day, the Board's direct Constitutional authority, as set forth in Article XII, §§ 2 and 3 of the

---

12. As part of its response to the Board's argument, Hovnanian has moved to dismiss the appeal as not allowed by law. We have considered its motion and deny it.

Constitution, is limited to those functions, which clearly do not encompass the issuance of wetlands licenses.

The wellspring of all other jurisdiction and authority of the Board emanates from the brief statement in § 2 of Art. XII that the Board "shall perform such other duties as may be hereafter prescribed by law." That is why, earlier in this Opinion, we noted that the Board's jurisdiction and authority over wetlands licenses is derived solely from statutory delegation by the General Assembly and not from any Constitutional or inherent authority the Board possesses on its own.

The greatest part of the Board's statutory authority lies in the general area of procurement—superintending or having approval power over the acquisition and disposition of interests in real property needed or owned by the State, construction of public facilities, and the acquisition of certain services needed by the State. *See,* in general Title 10 of the State Finance and Procurement Article (SFP). In this case, the Board and the individual appellants invoke some of that authority as part of what they regard as the Board's overarching composite jurisdiction over State wetlands.[13] Particular reference is made to SFP §§ 10–305 and 10–402. Neither has anything to do with the issuance of a wetlands license.

SFP § 10–305(a) permits the Board to approve the sale, lease, transfer, exchange, grant, or other disposition of any real or personal property of the State for a consideration the Board decides is adequate, provided the conditions set forth in § 10–305(b) have been satisfied. Apart from the fact that the record before us fails to show that the conditions in subsection (b) were satisfied, or even thought relevant, a wetlands license does not constitute or involve the sale, lease, or other disposition of the State wetlands. The Board's own wetlands regula-

---

13. The Board argues that its decision to deny a wetlands license "is legislative in nature, and not adjudicatory, because it flows from the exclusive authority over disposition of State property that the General Assembly has vested in the Board, involves broad public policy issues, and is not the product of a contested case hearing."

tions make that clear. *See* COMAR 23.02.04.01A and D.[14] Similarly, SFP § 10–402 applies only to the conveyance of *title* to land owned by the State as a result of the relationship of the land to the waters of the State. Whatever general discretion the Board may have under either of those statutes when considering the conveyance of title or a leasehold interest has no relevance to the issuance of a wetlands license. The Board's authority with respect to a wetlands license emanates solely from and is controlled by ENV title 16, subtitles 1 and 2. As we have observed, the applicable standard that guided the Board's discretion in that regard, at the time, was ENV § 16–202(c)(1), which now appears as § 16–202(g)(1):

> "Upon receipt of a report by the Secretary [of DOE], the Board shall decide if issuance of the license is in the best interest of the State, taking into account the varying ecological, economic, developmental, recreational, and aesthetic values each application presents. If the Board decides to issue the license, the issuance of the license shall be for consideration and on terms and conditions the Board determines."

### Nature of That Function: Quasi–Judicial or Quasi–Legislative

 The parties spend some effort explaining their different positions as to whether the Board's decision not to issue a license was quasi-judicial or quasi-legislative in nature. The practical importance of that ordinarily lies in its impact on the standard of review that courts must apply in resolving chal-

---

**14.** Section 01A. provides that a license does not convey ownership of lands below the mean high water line or tidal waters of the State or the affected air space, or diminish the full and free use and enjoyment of the tidal waters of the State by the public. Section 01D provides that it is not the intent of the wetlands regulations "to address fully the range of fiduciary and proprietary responsibilities of the Board of Public Works relating to the private uses of State wetlands. These matters may be considered by the Board of Public Works through easement, lease, quit-claim deed, or other instrument to protect the State's interests or to convey an interest in State wetlands."

lenges to the administrative decision, essentially how much deference the court must give to the agency's determination.[15] As far back as *Hyson v. Montgomery County*, 242 Md. 55, 62, 217 A.2d 578, 583 (1966), this Court recognized, at least up to then, that "no one has been able to delineate, with precision and accuracy, an exact formula for determining the line of demarcation between the differences between legislative and judicial functions" especially "when mixed, blended, or combined functions are given, and exercised by, the same official, board, or agency . . ."

Although we generally have characterized the two functions, it does not appear that we are any closer to such a precise line of demarcation now. In *Queen Anne's Conservation v. County Comm.*, *supra*, 382 Md. 306, 326, 855 A.2d 325, 337, we confirmed our previous statement in *City of Bowie v. County Comm'rs*, 258 Md. 454, 463–64, 267 A.2d 172, 177 (1970) that "the test to determine when action is legislative and when executive or administrative is 'whether the [action] is one making a new law—an enactment of general application prescribing as new plan or policy—or is one which merely looks to or facilitates the administration, execution, or implementation of a law already in force and effect.' "

---

**15.** Whether by statute (*see* Md.Code, State Government Article, § 10–222, for example) or by common law, courts look for three things when reviewing a *quasi-judicial* decision: (1) were the findings of fact made by the agency supported by substantial evidence in the record made before the agency; (2) did the agency commit any substantial error of procedural or substantive law in the proceeding or in formulating its decision; and (3) did the agency act arbitrarily or capriciously in applying the law to the facts—in essence, whether a reasoning mind could reasonably reach the conclusion reached by the agency from the facts in the record. With respect to the findings of fact, judicial review is highly deferential. With respect to determining legal error, it is much less so. *See Spencer v. Board of Pharmacy*, 380 Md. 515, 846 A.2d 341 (2004); *Bayly Crossing v. Consumer Protection*, 417 Md. 128, 9 A.3d 4 (2010). If the agency acted in a *quasi-legislative* capacity, the scope of judicial review is limited to "assessing whether the agency was acting within its legal boundaries." *Schade v. Board of Elections*, 401 Md. 1, 38, 930 A.2d 304, 326 (2007); *Judy v. Schaefer*, 331 Md. 239, 265, 627 A.2d 1039, 1052 (1993), quoting from *Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 224, 334 A.2d 514, 523 (1975).

In *Overpak v. Baltimore*, 395 Md. 16, 33, 909 A.2d 235, 245 (2006), we adopted the view of the Court of Special Appeals in *Armstrong v. Baltimore*, 169 Md.App. 655, 906 A.2d 415 (2006) that an agency acts in a quasi-judicial function when "(1) the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property ... and (2) there is a deliberative fact-finding process with testimony and the weighing of evidence." Normally, that requires a contested case hearing, so that evidence (as opposed to informal statements of general beliefs) may be presented, challenged, and analyzed, in order that reasonable credibility determinations can be made.

The nature of the Board's decision with respect to a wetlands license has aspects of both quasi-judicial and quasi-legislative functions. It is quasi-judicial in that it is property-specific—whether the applicant should be permitted to dredge or fill specific State wetlands in the particular manner it wishes. That focuses on the nature and extent of the impact of the proposed activity on specific wetlands, which is fact-driven and susceptible to the deferential standard of judicial review applicable to quasi-judicial proceedings. Yet, in clear contrast to the situation with respect to the issuance of a *permit* for activity on *private* wetlands, at no point in the application process—not before DOE, the Wetlands Administrator, or the Board—is anything approaching a contested case hearing required. Indeed, the Board itself is not required to have any kind of hearing at all, which seems antithetical to the notion of a quasi-judicial proceeding. Apart from that, even under ENV § 16–202, the Board possesses a great deal of largely unguided discretion in determining whether to issue a license and on what terms and conditions, which ordinarily would call for the expanded judicial deference that attaches to quasi-legislative decisions.

In this case, the distinction is largely irrelevant. Although Hovnanian contended, among other things, that the Board's decision was not supported by substantial evidence in the record which, if so, would clearly be a ground to vacate that decision if it was quasi-judicial in nature, the Circuit Court, in

light of its conclusion that the Board's rationale for denying the license was *legally* erroneous, found it unnecessary to address that argument, and, because we agree with the Circuit Court's conclusion, we need not address it. If, as we shall hold, the Board applied incorrect standards in making its determination—standards that caused it to exercise an authority beyond that which was delegated by the General Assembly—it would have "exceeded its statutory authority" if its decision was quasi-judicial and would not have been "acting within its legal boundaries" if its decision was quasi-legislative.

### *Wrongful Standard Applied By The Board*

■ Hovnanian needed a license because four elements of its project impacted, in particular ways, 9,939 square feet of State wetlands. The nature of those impacts, in light of the conditions recommended and the mitigation agreed to by Hovnanian, was considered by DOE and the Wetlands Administrator and was properly the subject of their respective reports recommending issuance of the license. There is nothing in the record before the Board challenging, or even purporting to challenge, the conclusions reached in those Reports. Neither the Comptroller nor the Governor, in explaining the reasons for their vote, addressed that impact. Neither of them even suggested that they disagreed with the conclusions reached by DOE or the Administrator that the direct impact on the State wetlands was minimal and that, through the 2:1 replacement ratio and other mitigation efforts, any adverse impact was well compensated. Neither of them expressed any disagreement with any of the subsidiary conclusions noted in the two Reports or with the recommended conditions.

As we have observed, although seemingly recognizing that the Board's authority was limited to whether a wetlands license should be issued at the particular site and not whether the project as a whole should proceed, the Governor made absolutely clear in his remarks that his negative vote was based entirely on his "common sense" view that putting "1,350 units densely crammed into a critical area of the bay" would

"do further damage to the wetlands and critical areas of the bay," not to mention the public safety problem of evacuating 1,350 senior citizens in the event of a hurricane. It is clear from that statement and others made during the course of the hearing that the Governor viewed the role of the Board in considering a wetlands license as extending beyond that of DOE and the Wetlands Administrator and encompassing a broader mandate to protect the ecology of the Chesapeake Bay and its tributaries and the public safety of the residents of Kent Island and Queen Anne's County.

We do not question whether the environmental concerns expressed by the Governor were genuine. The Treasurer and the Comptroller also expressed reservations about the location of the project, as did the Secretaries of DOE and Planning and the Director for Emergency Services for Queen Anne's County, all of whom felt that current laws and regulations regarding the placement of large developments in the vicinity of the Chesapeake Bay needed to be changed.

The point, clearly explained by the two Secretaries, however, is that, in deciding whether to issue a wetlands license, the Board does not act—is not authorized to act—as a super land use authority. Its own regulation, COMAR 23.02.04.10, limits its focus to considering the recommendations of DOE and the Wetlands Administrator and taking into account the ecological, economic, developmental, recreational, and aesthetic values "to preserve the wetlands and prevent their despoliation and destruction," not to determine whether the project as a whole is environmentally sound at its particular location. That authority lies elsewhere.

The decision to allow a development to proceed within the Chesapeake Bay or Atlantic Coastal Bays Critical Area is specifically committed by law to the jurisdiction of the affected counties and the Critical Area Commission for the Chesapeake and Atlantic Coastal Bays, created by Md.Code, § 8–1803 of the Natural Resources Article (NR). *See Critical Area Commission v. Moreland,* 418 Md. 111, 12 A.3d 1223 (2011); *Smith v. Kent County,* 418 Md. 692, 18 A.3d 16 (2011). In enacting

the laws governing development in those critical areas, the General Assembly made clear that its purpose was:

"(1) [t]o establish a Resource Protection Program for [those areas] by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats; and

(2) [t]o implement the Resource Protection Program on a cooperative basis between the State and affected local governments, with local governments establishing and implementing their programs in a consistent and uniform manner subject to State and local leadership, criteria, and oversight."

NR § 8–1801(b).

The State agency given general supervisory authority over the development and implementation of the Resource Protection Program is the Chesapeake and Atlantic Coastal Bays Critical Area Commission, a unit within the Department of Natural Resources. *See* NR §§ 8–1803 and 8–1806. Nowhere in that entire subtitle that creates and governs the program is the Board of Public Works even mentioned, much less given any authority to control development. That is the case as well with the designation of priority funding areas, which is likely to be critical to large developments generally and was critical to this one. As was explained, that program is part of the State's "smart growth" initiative codified in SFP §§ 5–7A–01 through 5–7B–10. Although the Board has approval power over State funding for developments in areas other than designated priority funding areas (*see* SFP §§ 5–7B–05 and 5–7B–06), it is given no such approval power over developments within priority funding areas designated by the counties and municipalities. *See* SFP §§ 5–7B–03(a)(1) and 5–7B–04.

The language of ENV § 16–202(c)(1) [now § 16–202(g)(1) ] cannot reasonably be read to broaden the jurisdiction of the Board in such a manner as to trump the clear commitment of land use policy to the local governments and, in part, to the Critical Area Commission and other State agencies. The requirement that the Board consider the ecological, economic,

developmental, recreational, and aesthetic values presented in the application in determining whether issuance of the license is in the State's interest has reference to the impact of the proposed dredging or filling on the affected wetlands. Section 16–102(b), which declares the public policy behind the Wetlands Law, makes abundantly clear that those considerations are tied to the desire "to preserve the wetlands and prevent their despoliation and destruction," not to control all development near the Chesapeake Bay, and the Board's own regulation confirms that narrower focus.

That same limitation dooms the Board's reliance on CO-MAR 23.02.04.01B as a basis for considering the environmental impact of the entire project, rather than just the effect of the four elements on the 9,939 square feet of wetlands directly impacted by those elements.

Section 01B of the regulation deals with "Public Interests." Paragraph (1) defines "public interests" as "the demonstrable environmental, social, and economic benefits which would accrue to the public at large as a result of a proposed action or activity involving State wetlands, and which would exceed all demonstrable environmental, social, and economic costs of the proposed action or activity." Paragraph (3) includes within "public interests" the preservation of tidal wetlands, conservation of natural values and living resources, fishing and crabbing, navigational needs, water access and related recreation, and maritime commerce. That is what the Board is to consider.

Paragraph (2) of the regulation requires that "[i]n determining the public interest in a request for a private use, structure, or activity over, on, in, or under State wetlands or severance of materials from State wetlands, the Board of Public Works shall consider the ultimate project and beneficial purposes to be served." The Board, weaving in its view that it is "the agency with exclusive authority over the disposition of State property," latches on to the requirement that it "consider the ultimate project" to argue that it was entitled to look beyond the impact of the four elements on the small area of wetlands

and consider, and find conclusive, the impact of the entire project on the economy, ecology, and public safety of the entire area, including the entire Chesapeake Bay, as authorized by the COMAR regulation.

Hovnanian, dismissing the relevance of the Board's approval authority over the actual disposition of State property under SFP, contends, first, that the Board is misreading the regulation and second, that if the Board's interpretation is correct, the regulation is inconsistent with the statute and, to that extent, invalid. Hovnanian is correct in both respects.

■ Although a reviewing court is required to give considerable deference to an agency's interpretation of its own regulation, the interpretation of a regulation is akin to the interpretation of a statute. It is an issue of law which, ultimately, the court must decide. *See Cathey v. Dept. of Health*, 422 Md. 597, 604, 31 A.3d 94, 98 (2011) (despite the deference due to an agency's interpretation of its own regulation, "[f]or cases in which an agency interprets its own regulations, we have held that 'questions of law are completely subject to review by the courts.' and that this Court 'is not bound by the agency's legal conclusions; we are, in short, under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law' ").

Paragraph B(2) of the regulation must be read in harmony with paragraph B(1). Its clear intent is to allow the Board, if it finds "demonstrable environmental, social, and economic *costs* of the proposed action or activity" (emphasis added) which, taken alone, might make issuance of a license *not* in the State's interest, to consider whether the ultimate project and beneficial purposes to be served exceed those costs, thereby, on balance, making the license consistent with the State's interest. As we have observed, evidence was presented to the Board by both the Wetlands Administrator and the president of the Queen Anne's County Chamber of Commerce indicating a positive economic benefit from the project, which the Board chose to ignore.

The Board seeks to reverse that analysis and allow it to consider the environmental *cost* of the ultimate project on the ecology of the entire region as a basis for denying a license that would have a minimal cost on the affected wetlands. Such a reading is not only contrary to the plain wording of the regulation but would achieve what the statutory scheme does not permit.

Finally, in this regard, a comment on the rationale expressed by the Comptroller. To the extent that he based his decision on his view of the effect of the entire project on the Chesapeake Bay as a whole, it suffers from the same defect as that of the Governor. His principal concern, however, seemed to be his belief, gleaned from some *ex parte* private conversations he apparently had with some of the Queen Anne's County Commissioners and a letter from the county attorney, that, despite the views of the Attorney General's Office to the contrary, there was a "gag order" of some kind that precluded Queen Anne's County Commissioners from expressing opposition to the application.[16]

The Comptroller expressed that view at the May 9 hearing and maintained it even after he received the opinion from the Attorney General's Office and had the opportunity to question the Deputy Attorney General at the May 23 hearing. There is no indication in the record that either the Comptroller or the Board itself ever formally requested that the current commissioners appear or submit written material or that they ever formally notified the Board that they felt precluded from appearing. The issue before the Board, as we have noted, was whether the impact on the affected wetlands of the four elements that comprised the application was sufficiently adverse as to make it in the State's interest to deny the application. There is nothing in the record before the Board to indicate that any commissioner had a view with respect to

---

16. Two commissioners, Mike Koval and Gene Ransom, appeared at the March 2003 hearing conducted by DOE and expressed opposition to the project. As we indicated, Mr. Koval—by then a former commissioner—appeared before the Board at its May 9 hearing in opposition.

that issue. Accordingly, as stated by the Deputy Attorney General, it was, indeed a "red herring" and not a legitimate basis for denying the application.

### *Remand*

■ The error committed by the Board was one of law—applying the wrong standard in formulating its decision. The appropriate remedy in such a situation is to vacate the decision and remand for further proceedings designed to correct the error. *Bereano v. State Ethics,* 403 Md. 716, 756, 944 A.2d 538, 561 (2008); *O'Donnell v. Bassler,* 289 Md. 501, 511, 425 A.2d 1003, 1009 (1981). In this case, that would be for the Board to consider whether, applying the considerations set forth in ENV § 16–202(g)(1) and its own regulations, as construed in this Opinion, issuance of the license is in the State's interest.

JUDGMENT OF CIRCUIT COURT FOR QUEEN ANNE'S COUNTY VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE DECISION OF BOARD OF PUBLIC WORKS AND REMAND THE CASE TO THE BOARD FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY APPELLANTS.